JAMES GUILFORD, plaintiff in error, vs. THE STATE OF GEORGIA, defendant in error.

T. & C. were engaged in a fight in which, T. stabbed C. to death. G. interfered by laying hold of C. The evidence was such, as to raise a reasonable doubt, whether G's object in this was not rather, to separate T. & C., than to aid T. The jury found G. guilty of murder.
*Held,* That the verdict was contrary to the evidence.

Murder, from Muscogee county. Tried before Judge WORRILL, November Term, 1857.

The bill of exceptions in this case was filed, alleging error in the decision of the Court below in refusing a new trial under the following circumstances.

James Guilford the plaintiff in error, was indicted for murder, and on the case coming on for trial in November Term, 1857, prisoner's counsel moved for a continuance, grounding his application on an affidavit made by the prisoner, that he could not go safely to trial, as the alleged crime was committed during the then term of the Court, and that the public excitement was such that he feared he could not obtain a fair trial.

The Court overruled the showing for a continuance and the prisoner excepted.

The parties then proceeded to select and empannel a jury, and while doing so, Stephen D. Lewis was called and sworn by the Solicitor General, and asked the questions prescribed by the Statute, which questions Lewis so answered as to make himself a competent juror. Prisoner's counsel then proposed to ask him " whether or not he (Lewis) had not said to the counsel for the prisoner on the morning of the trial, in the court room, that the prisoner was guilty, and ought to be hung." The Court refused to allow the question to be put, deciding that when a juror had qualified himself under the statute it was not competent for the prisoner to

disqualify the juror by his (the juror's) own oath; and to this decision the prisoner excepted.

The following witnesses were examined on the part of the' State:

*George Morman* testified: That he and deceased went to Jane Wardsworth's, there were some four or five countrymen there, they stayed there about three-quarters of an hour. Witness got up and went and knocked at the door, they both asked if that was witness: he replied yes, and told deceased to come and go, and said he was going. Deceased asked witness to wait and not leave him. In a minute or two, Thompson and the prisoner at the bar came there and knocked at the back door, and came in together—Thompson with his knife open, and walked by witness and went to the room where deceased and Playmile were, and either pushed or knicked the door open, and after they got in Thompson hugged and kissed Miss Playmile, and said this is too sweet for niggers. Thompson turned round, pulled out a $10 bill and said that he would bet it he could whip any God damned son of a bitch in the house. Deceased said he would bet $25 no one in the house could whip him. Thompson showed his hand with the $10 on the bureau, and said he would bet it, he could do it, and seized deceased by the coat collar, saying that God damn him, he was not scared of him (deceased,) and shook him awhile and flourished his knife around deceased. Witness caught Thompson and told him to behave himself. Thompson replied, if witness did not turn him loose, God damn him, he would cut him (witness,) and again caught deceased. Deceased said, if. Thompson attempted to cut him with his knife, he would blow a ball through him. Thompson flourished his knife around the face of deceased and struck deceased in face with flat side of knife. Deceased then struck Thompson in the stomach or breast; they then closed together and pulled out in the entry, deceased trying to pull loose, and Thompson holding him, and in this

way they went out doors and into the back yard; as they went out doors saw prisoner kick or knock deceased; at Thompson and prisoner afterwards came in the house together; Thompson asked if witness saw him cut him; witness replied no; he then said he had cut deceased GOD damned deep, and showed the knife which he then had in his hand open. Witness then left and came to Griffin's bar, and prisoner followed after him and came with him as far as the bar, and witness saw prisoner no more. All this was between 11 and 12 o'clock at night. Witness identifies the knife. All this was on the 4th December 1857, on Friday night. Guilford is older and stouter than deceased, who was about 21, and would weigh about 140 pounds.

*Cross-Examined*—Hardly ever saw Thompson without he had his knife. Prisoner had no weapon. 'Twas a dark night. Heard some one tell deceased and Thompson not to fight; dont know who it was. Thinks prisoner cowardly; not a fighting man. From seeing prisoner's arm, does not think he is strong in it. 'Twas a dark rainy night. Jane Wardsworth shoved deceased, prisoner, Thompson and Barbara, out of the house and closed and barred the door. Witness was excited and scared. Prisoner was then about half drunk. Thompson was drunk. Thompson loved Barbara.

*Re-Examined*—I thought it was Jane Wardsworth told them not to fight.

*John B. Griffin,* testified: On the night deceased was cut, Thompson and prisoner were at his house all the evening, both were drinking considerably about nine or ten at night.

*Matilda Wilson,* sworn, testified: That at the time of cutting, Mr. Morman, Jane Wardsworth, Barbara Playmile, herself and sister, were at Jane Wardsworth's; Thompson knocked at the door, and Morman let them in, (prisoner and Thompson;) Thompson commenced talking with Barbara Playmile, and turned round and said, "hallo, Calhoun, you here; what's all the news;" deceased said, "none at all. Deceased then asked Thompson the news, Thompson re-

plied, "nothing, I'm drunk again." *Thompson* had a knife in his hand; heard nothing pass between them; they then went out the door together, to-wit: Thompson, prisoner and deceased; deceased seemed to be trying to get away. Deceased run after they got in the back yard, and witness saw through the bottom of the window Thompson strike him one lick. Prisoner was there standing by the side of Thompson. They were out of doors 15 or 20 minutes. Witness supposes Thompson and prisoner came back in the house together; while they were in the yard, Calhoun said, "gentlemen if I have got any friends, take the knife away from him."

*Cross-Examined*—Prisoner had no knife. Witness saw no blow by prisoner. Prisoner was drunk; he went off with Morman.

*Barbara Playmile*, deposed: On the night deceased was cut, he and Morman came to Jane Wardsworth's together; deceased asked if witness had a room, witness answered she had, and he asked witness to walk into her room that he wished to talk. They had been there three-quarters of an hour, when Thompson and the prisoner came. As they came in, deceased was in the act of leaving. Thompson commenced conversing with witness, and did'nt take any notice of deceased for five or six minutes; he then turned and said "hallo, Calhoun, you here." Deceased said he was. Thompson asked deceased how he came on, and the news; deceased said he had no news. Deceased asked Thompson the news; he replied he had none, only he was drunk; and Thompson then turned back and began to talk with witness. Thompson then pulled out a $10 bill, and asked witness if she did not want it. Witness said no, and told him to put it back. Thompson put it back, and began to talk with witness. Thompson then pulled out the bill and said he would bet it, that no man who had anything against him could whip him. Deceased pulled out $5 and threw it by Thompson's $10, and said that he would bet five

to ten, that no man could whip him, and that the first man who struck or drew a knife on him, he would blow a day-light hole through him. Deceased run his hand under his coat, as if to draw a pistol, and Thompson run up and caught him by the collar. Deceased told Thompson several times, to let him loose. Thompson would not do it. Deceased then struck Thompson in the face. Witness then left her room, and left prisoner standing in the door by Thompson. Witness saw no more, except that she saw deceased start out of the door, and Thompson and prisoner followed him. Thompson when he first came in, had his knife open and kept it in his hand, all the time. Prisoner and Thompson both seemed to be after deceased as he went out of the door. After this, prisoner and Thompson came back in the house, and Thompson said he had cut deceased and had cut him deep. Thompson staid at the house till morning.

*Cross-Examined*—When deceased and Thompson were about to fight, prisoner said, boys don't fight in the house, and caught the arm of Thompson. Jane Wardsworth shut the door as the three went out. Thompson always came in the house with his knife open—'twas his habit.

*Dr. John H. Carriger*, stated: That on the night deceased was cut, he was called to see him. Deceased was very faint from loss of blood, and the wounds on his person. He breathed with difficulty. Witness found him with a wound on the left side entering about the cartileges of the ribs pene-trating the stomach, one entering the chest cavity a little be-low in front of left shoulder blade, and other less important wounds, over various parts of his body. The two wounds first mentioned were in opinion of witness, mortal. Deceas-ed asked witness to come to see him; that he was dying and wanted to bid him farewell; that he knew witness would do all he could for him, and asked forgiveness for his former bad treatment of witness. Told deceased that though bad-ly wounded, witness hoped he would recover. Deceased re-plied, that he knew he was dying. Deceased said the wounds

were inflicted for a little cause. Deceased lived from Friday till Sunday.

*William McMichael,* said, the deceased came to his house on Friday night about eleven or twelve o'clock, and said that he was cut and bound to die. Deceased was very bloody, faint, and asked to lie down. He staggered when witness took hold of him, and laid him down in the front room. Witness asked him how he let a man cut him up so; deceased said there were two of them. Witness asked him who cut him, and he said James Thompson, and that prisoner held him while Thompson cut him; that prisoner pulled him out of the house, and kicked him as he went out.

*John Duncan* said, that he saw deceased on the night he was cut, at the house of Griffin on front street. He asked for Jack Gammell. Deceased was bloody. Witness went to him and asked what he wanted. He replied, he wanted witness to go with him after a doctor. Witness started with him. Deceased got short of breath; witness caught him and suggested his going to his brother's-in-law, and took him there. His brother-in-law went for the doctor, and witness stayed till the doctor came. Asked deceased where and how he got cut. He said he was bound to die. Thompson cut him at Jane Wardsworth's; that Thompson and prisoner came there together, and that he was lying on a bed with a woman; that when Thompson said he could whip any God damned son of a bitch in the house, he rose up and Thompson clinched him, and prisoner took hold of him and made out that he was trying to part them, but would not do it till he deceased was cut all to pieces.

*Catharine Calhoun,* testified: That about half-past eleven or twelve o'clock on Friday night, she saw the deceased; he was covered with blood; when he saw witness, he handed out his hand and said farewell sister, farewell, I am a dying man. Witness asked him how he came in that fix he replied, sister, I was in a bad house. Witness asked him why he did not run, and he replied, how could I run, while

the prisoner held me by the arm Thompson cut me. Deceased exhibited no ill-will to Thompson or prisoner, that witness could see. Deceased said, sister get down and pray for me; my trust is in the Lord, but you pray for me. He was good and pious.

Counsel for the prisoner objected to the admission of so much of the testimony of John H. Carriger, Wm. McMichael, John Duncan, and Catharine Calhoun, as related to the declarations of the deceased.

The Court overruled the objection and allowed all the evidence to go to the jury, and to this the prisoner excepted.

It was admitted by the prisoner's counsel in the argument, that Thompson killed the deceased, and that prisoner went with Thompson on the night in question, to Jane Wardsworth's, and was present when Calhoun was killed. The Court thereupon charged the jury, that if they should believe that the prisoner went with Thompson to the house of Jane Wardsworth with no common intent between them to have a difficulty with Calhoun, and when they got there a fight took place between Thompson and Calhoun in the house, and prisoner participated or took part in it, and after they got out into the yard, Thompson stabbed Calhoun and prisoner held him, so that Thompson might cut him, and Calhoun died of the wounds then inflicted on him, then prisoner is guilty of the crime of murder, as much so as if the fatal wound had been inflicted with his own hand. But if the jury should believe from the evidence, that prisoner did not take part in the fight, that he did not hold Calhoun so that Thompson might cut him, but that he only interfered to separate the parties, then he was guilty of no crime, and the jury should acquit him.

To this charge the prisoner excepted.

The jury found the prisoner guilty of murder. Prisoner's counsel moved the Court to commute the punishment from

death to perpetual imprisonment, on the ground that the evidence on which he was convicted was circumstantial. The Judge said that if he believed he had the power, he would commute the punishment, but that in his opinion the evidence was not circumstantial, and he had no power over the matter; and to this decision prisoner excepted.

At the same term the prisoner moved for and obtained a rule *nisi* for a new trial on the following grounds:

1st. Because the Court erred in overruling the showing of the prisoner for a continuance.

2d. Because the Court erred in refusing to allow the prisoner to ask Stephen D. Lewis, who had qualified himself as a juror in answer to the questions propounded to him under the statute, and was put by the State on the prisoner: " Whether or not he Lewis had not said to the counsel for the prisoner on the morning of the trial in the Court room that the prisoner was guilty and ought to be hung."

3d. Because the Court erred in admitting in evidence the declarations of the deceased as set out in the brief of the testimony.

4th. Because the jury found contrary to law.

5th. Because the jury found contrary to the weight of the evidence.

6th. Because the jury found contrary to the evidence.

7th. Because the Court erred in refusing, on motion of prisoner's counsel, to commute the punishment to perpetual imprisonment, stating that he would commute the punishment, but in his opinion the evidence was not circumstantial, and it not being so, he had no power so to do.

The Court after argument, overruled the motion for a new trial, and prisoner excepted.

C. J. WILLIAMS and J. J. SLADE, for the plaintiff in error.

Solicitor General, OLIVER, for the State.

*By the Court.*—Benning, J. delivering the opinion.

The Court below refused to grant the motion for a new trial. Was that right?

One of the grounds of the motion was, that the verdict was contrary to the evidence. Was this ground well founded?

There can be no doubt, that Guilford interfered in the fight between Thompson and Calhoun, by laying hold of Calhoun He may have done this to aid Thompson, or he may have done it, to separate the combatants. If the former was his object, he was guilty; if the latter was his object, he was innocent.

Which was his object? Or, rather, is it clear beyond a reasonable doubt, that the former, and not the latter, was his object? This is the question, so far as the present ground is concerned.

The answer to the question, depends, mainly, on the dying declarations of Calhoun himself.

Duncan's testimony as to these declarations is, that Calhoun declared, that "when Thompson said he could whip any God damn son of a bitch in the house, he rose up, and Thompson clinched him, and prisoner took hold of him, and made out like he was trying to part them, but would not do it, till he deceased was cut all to pieces."

According to this, Guilford "made out like he was trying to part them," all the time, and finally did part them, though not until after the mortal wounds had been given.

That Guilford was merely feigning an effort to part the combatants, could have been only matter of *opinion*, with Calhoun. Is there not enough to raise a reasonable doubt, as to whether, he was not mistaken in this opinion?

The time of the fight was eleven or twelve o'clock of a dark rainy night. Calhoun therefore, in getting his impressions, would be deprived of the aid of a sense the most important of all, the sense of sight. Guilford was drunk;

and a drunken man can make but an awkward hand at parting two men fighting. It may well be, that the honest efforts of such a man to accomplish that object, would operate unfairly; and if they do, it is most natural that the party against whom they so operate, will construe them into foul play. Guilford did, finally, part the combatants; true, not until after Calhoun was "cut all to pieces." But there is no evidence to show, that Guilford, if trying to part them in good faith, could, by his utmost efforts, have done it sooner than he did. He was drunk—he was a man "not strong" in his arms—the night was dark and rainy—the stabbing was probably completed in a few seconds, after the parties commenced fighting. And if Guilford was merely feigning, why should he part them, as long as Thompson was disposed to fight. In the dark he could not know the extent of the wounds inflicted by Thompson, if he could know, that wounds were inflicted at all. And if his object was to aid Thompson, why should he separate them until he knew this? Why rather, should he not continue the aid, until Thompson expressed himself satisfied, or desisted from the fight? And then, what motive was there, for Guilford's joining Thompson in the fight. He had no cause of quarrel with Calhoun. No word of insult, or of anger, had passed between them. It was Thompson, that was attached to the woman, Playmile, not he. The connection between him and Thompson, seems to have been transient. They came to the house together, but came there in ignorance of whom they were to meet. Guilford departed almost directly after the fight, in company with Morman, a friend of Calhoun, leaving Thompson behind, where he stayed all night. When the parties were about to fight in the house, Guilford said, "boys, dont fight in the house, and caught the arm of Thompson."

We think that there is enough to raise a reasonable doubt, as to whether Guilford was not really, rather than feignedly, merely, endeavoring to separate the combatants.

If there is, the verdict was contrary to the evidence.

This ground of the motion, then, is in our opinion, a good ground.

There is nothing in the second ground.  *King vs. The State* 21, *Ga.* 221.

Nor is there anything, in the first and third grounds.  See *Thompson vs. The State,* argued and decided immediately before this case.

The fourth and fifth grounds are involved in the sixth, which has already been considered.

The case is manifestly, not one of circumstantial evidence. Therefore, the seventh ground is without foundation.

A new trial is granted on the sixth ground alone, viz : that the verdict was contrary to the evidence.

Judgment reversed.