OF THE

# SUPREME COURT OF APPEALS

OF

# WEST· VIRGINIA

## CHARLESTON

### STATE *v.* CLIFFORD.

Submitted January 11, 1906.   Decided February 13, 1906.

1. HOMICIDE—*Evidence—Threats.*

   On the trial of an indictment for murder, evidence of threats, made by the deceased or his co-conspirator, previously communicated to the accused, is competent and proper for the purpose of shedding light upon the mental attitude of the prisoner toward the deceased at the time of the homicide, and of explaining the possession of the weapon with which the killing was effected, as tending to rebut any inference of malice which might be drawn from the fact of its possession on the occasion of its use.   (p. 8.)

2. HOMICIDE—*Evidence—Threats—Conspiracy.*

   When, in such case, there is evidence tending to establish a conspiracy on the part of the deceased, and other persons, to kill the accused, or do him grave bodily injury, and to show that the accused believed, and had reasonable ground to believe, that such conspiracy existed and the deceased was a party thereto, and the killing ensued, immediately after an unprovoked assault upon, and severe beating of, the accused, by such other persons, the deceased standing by at the time, and there being evidence tending to show that he joined in the assault, evidence of threats made by such other persons and communicated to the accused before the assault, is admissible.   (p. 9.)

3. CRIMINAL LAW—*Instructions, Setting Forth Forms of Verdict.*

   An instruction setting forth six forms of verdict, proper for findings on an indictment for murder, and telling the jury that, under

the indictment, they can return any one of said verdicts, is defective in failing to direct the attention of the jury to the requirement that any verdict so returned must be based upon their belief from the evidence; but if it appears from other instructions given at the same time, that the attention of the jury was repeatedly directed to this requirement, the giving of such instruction is not error. (p. 15.)

4.   CRIMINAL LAW—*Homicide—Instructions— Intent—Deliberation.*

It is not error to give, as an instruction to the jury in a criminal trial, the following legal proposition: "The court instructs the jury that to constitute a willful, deliberate and premeditated killing, constituting murder of the first degree, it is not necessary that an intention to kill should exist for any particular length of time prior to the actual killing; it is only necessary that said intention should come into *existance* for the first time at the time of such killing, or any time previous." (p. 16.)

5.   CRIMINAL LAW—*Homicide—Instructions—Degrees of Offense.*

On the trial of an indictment for murder, it is not error to give instructions, presenting the theories of guilt of murder of the first and second degrees, and directing the attention of the jury to the presumption of guilt, arising from certain facts, in case the jury should believe them to be established by the evidence, if there is any evidence tending, in any appreciable degree, to prove such offense. (p. 17.)

6.   HOMICIDE—*Instructions—Manslaughter.*

When the homicide, in respect to which the accused is on trial, immediately followed an unprovoked assault upon, and severe beating of, him, and the evidence tends to prove the offense of manslaughter, the court may properly give instructions based upon the theory of guilt of murder, if there is any evidence in the case tending to prove the commission of such crime. (p. 18.)

7.   HOMICIDE—*Instructions—Defenses—Accidental Killing.*

The defense of accidental and unintentional killing does not preclude the giving of instructions embodying the law relating to any offense charged in the indictment which the evidence tends to prove. (p. 18.)

8.   INSTRUCTIONS—*Construction of as a Whole.*

To determine whether the trial court has erred in the giving of instructions, all the instructions must be read together, and, if being so read and interpreted according to the plain common-sense meaning of the terms used, they state the law correctly as applied to the evidence, and it appears that the jury could not have been thereby mislead to the prejudice of the accused, the verdict will not be disturbed, because they disclose a mere technical conflict in terms. (p. 23.)

9.   EVIDENCE—*Refusal of Court to Permit Witness to Answer—Appeal.*

Refusal of the court to permit a witness to answer a question

which, by its own terms and subject matter, taken in connection with facts and circumstances, already in evidence, shows its relevancy and materiality, is not available as error on a motion for a new trial, if the expected answer of the witness was not disclosed to the court at the time of the ruling. An appellate court, in reviewing a judgment on writ of error, cannot assume, in such case, that an answer favorable to the exceptor would have been given. So much of the decision in *Gunn* v. *Railroad Co.*, 36 W. Va. 165, as conflicts with this principle, is disapproved. (p. 11.)

10. HOMICIDE—*Manslaughter—Evidence—Killing in Heat of Blood.*
A sudden intentional killing with a deadly weapon, by one who is not in any way at fault, in immediate resentment of a gross provocation, is *prima facie* a killing in heat of blood, and, therefore, an offense of no higher degree than voluntary manslaughter. (p. 21.)

11. HOMICIDE—*Manslaughter—Evidence—Deliberation—Reversal.*
When in such case, the evidence discloses that no time intervened between the giving of the provocation and the act of killing, within which passion could have subsided and reason regained its dominion and the fatal act itself was not attended by circumstances of extreme cruelty and inhumanity, nor preceded by conduct from which malice can be inferred, a conviction of murder in the second degree should be set aside and a new trial allowed. (p. 21.)

12. CRIMINAL LAW—*Motion for New Trial—Insufficiency of Evidence.*
A motion for a new trial based on alleged insufficiency of evidence, is an appeal from the jury to the court on a question of law. (p. 23.)

13. CRIMINAL LAW—*Motion for New Trial—Insufficiency of Evidence— Functions of Court.*
In passing on such a motion, the court does not re-try the case on the evidence nor disturb any findings made by the jury on evidence sufficient in law to sustain them. It simply determines, whether, in law, the facts found, or which could have been found, constitute the right in action, or the offense charged. (p. 23,)

14. HOMICIDE—*Malice—Question for Jury.*
In homicide cases, the question of malice is for the jury when there is sufficient evidence to sustain a finding of its existence. Whether there is any evidence of it is a question for the court in giving or refusing instructions. Whether there is sufficient evidence of it to sustain a verdict, is for the court on a motion for a new trial. (p. 27.)

15. HOMICIDE—*Accidental Killing.*
In cases where the blow intended for one person by accident falls upon and kills another, the thing done follows the nature of the thing intended to be done, and the guilt or innocence of the slayer depends upon the same considerations that would have governed had the blow killed the person against whom it was directed. Hence the homicide is murder, or manslaughter, or excusable homicide,

for precisely the same reasons that would have determined its character had the event conformed to the intent, and the principle is the same whether the misadventure proceeded from the misdirection of the blow or from a mistake in the identity of the victim. (p. 30.)

Error to Circuit Court, Berkeley County.

Paul Clifford was convicted of murder, and brings error.
*Reversed.*

FAULKNER, WALKER & WOODS, for plaintiff in error.

C. W. MAY, Attorney General, for the State.

POFFENBARGER, JUDGE :

Paul Clifford, under sentence, by the circuit court of Berkeley county, of imprisonment for the period of ten years, upon conviction of the murder of Jacob Turner, has brought his case here on a writ of error.

The deceased came to his death by a shot from a pistol in the hands of the accused, but the circumstances of the killing were peculiar and unusual in some respects. Clifford was set upon and beaten in the night time by Charles and Joseph Cook, by way of punishment for an alleged insult to Jennie Cook, the wife of Joseph Cook, in the afternoon of the same day. No provocation was given by Clifford at the time of the assault. Having been accosted by the Cooks and charged with the language imputed to him, he denied it and attempted in every way to avoid any trouble with them. At that time, Jennie Cook was absent and the conversation continued until she came up and charged Clifford with having used the language in question, and thereupon Charles Cook struck him with his fist, and Joseph joined in the assault. At the time of the blow thus given, Clifford was standing with a pitcher of milk in his left hand, while his right hand held the pistol in the pocket of his pantaloons. There is evidence tending to show that the Cooks were aware of his possession of the pistol at that time, but, if they were not, they immediately discovered it and attempted to wrest it from him. In the struggle which ensued over the possession of the pistol, and during which the beating of Clifford continued, the pistol was discharged and the ball injured one of the fingers of Charles Cook. Soon afterwards, a second discharge of it sent a ball through the thigh of Joseph Cook. While the struggle was.

in progress, J. R. Clifford, father of the accused, came upon
the scene with a repeating shot-gun and called upon his son's
assailants to let go of him, threatening, in the event of their
refusal, to shoot them.   Thereupon, they broke away from
him, Charles Cook being the last to do so, but, before doing
so, he threw the accused backwards and then ran.   Imemdi-
ately after this, the pistol was discharged a third time and
the ball struck Turner in the head, killing him instantly.
Whether it was fired by design or accident, is a matter of
controversy, as is also the exact position in which the accused
was at the time of the shot.   Another matter as to which
there is contradictory evidence is whether Turner partici-
pated in the assault.   Charles Cook testifies that his brother
Joe, after having been shot, called upon Turner to assist in
taking the revolver from the accused.   The accused and one
other witness testify that, after the second shot, Turner did
join in the assault and continued to engage in it until the
arrival of J. R. Clifford.   J. R. Clifford testified that his son
was engaged with three men when he came up, but he was
unable, owning to the darkness, to recognize any of them.
Turner was found dead at a point about ten feet distant from
that at which the accused was released, and J. R. Clifford says
he saw a man fall a short distance from his son and in that
direction, at the time of the third shot.   Charles Cook says
he ran in that direction, upon leaving the accused, and, in
this, he is corroborated by another witness.   Several wit-
nesses swear that the accused rose to his feet and fired the
fatal shot after taking a step forward in the direction of
Turner.   One says he not only did this, but looked at the
deceased for about a minute before he fired.   The father of
the accused says the shot was fired as the latter arose from
the backward position in which he had been thrown by Cook.
The accused says he is unable to tell whether the pistol was
discharged as he was thrown backwards or as he was in the
act of rising, and that he saw nobody and shot at nobody at
the time and is unable to state whether he discharged it by
accident or design.   Two of the officers who took him into
custody on the night of the shooting, testify to an admission
by him to the effect that he shot Turner, in which he said, by
way of justification, that the deceased was coming towards
him with a razor in his hand.

To show justification for possession of the pistol by the accused at the time of the affray, as well as to excuse the killing, on the theory of a conspiracy on the part of the deceased and the Cooks, to kill the accused or do him great bodily harm, or, in case the jury should find the shooting to have been intentional, to mitigate the offense and reduce it to manslaughter, the facts relating to the transaction out of which the affray arose, and the conduct of Turner and the Cooks in the time intervening between that transaction and the affray, have been brought into the record. Sometime in the afternoon of April 6, 1905, the day of the killing, a dispute arose between two children, a brother of the accused and a son of the deceased, near the house in which the accused resided. This house and the one in which Joseph and Charles Cook resided stood almost opposite each other on West Martin street, in the city of Martinsburg. Jennie Cook, the wife of Joseph, was a niece of Jacob Turner. The accused separated these two children, and, in doing so, did or said something that offended Jennie Cook, in consequence of which there was verbal altercation between him and her. She claims he called her a vile name. He admits that, but says he was provoked to it by an opprobrious epithet applied to him by her; and, after he had done so, she informed him that she would tell her husband who would shoot him like a dog, and later repeated the threat in different form, in the presence of Dr. Gray and a sister of the accused, saying, "That's all right, you wait till Joe catches you, he'll fix you. He'll kill you, you dirty nigger." He says he was further warned by a little boy, Walter Johnson, who said, "Mr. Paul, Mr. Cook's going to shoot you." Charles Cook worked at a hotel in Martinsburg, where he was called for by Joe Cook at about five o'clock that evening. Just what passed between them, in the conversation there, he did not state. He first said he was busy and had no time to talk, but, later, admitted that he did talk to him and said, in response to a question as to whether he made an engagement, "I told him would be up home after a while." As soon as his work at the hotel was completed, he did go up to Joseph Cook's house, where he made his home, and where he found Jacob Turner and his brother Joe, standing near the front door. He either went in the house or started to go in, and very soon thereafter the

two Cook's and Turner started out the street in the direction
of the place at which the shooting occurred.  Turner did not
live on that street, but on a fifteen foot alley, 198 feet south
of said street back of the lot at the front of which he was
killed on that street.  The place of the killing was about four
hundred and ten feet west of the house in which the Cooks
resided.  Charles Cook says Turner remarked as he started
with them, "I am going over home," and that he and his
brother were going out on the hill, in the same general direc-
tion.  Whether Jennie Cook accompanied them all the way,
is not clear, but, if not, she followed them at no great dis-
tance, for she appeared on the scene very soon after the quar-
reling began.  Just before this procession started from the
house of Joseph Cook, the accused had left his house and
gone in the same direction to the house of one Smith which
stood outside of the corporate limits, for a pitcher of milk,
and, on the advice of his father, who knew of the threats, he
took the pistol with him.  He staid at the house of Smith
only long enough to obtain the milk, and, on his return, when
but a short distance from Smith's house, he was met by the
two Cooks, and, according to his testimony, Jacob Turner.
Thereupon the quarreling began as hereinbefore detailed and
continued until they reached the point at which the assault
was made.  The distance from Cook's house to Smith's is
six hundred and fifty feet.  According to all the testimony,
the assault was made in front of the house of William Brown,
standing on the north side of the street, four hundred and
seventy feet from Cook's house, and Turner's body was
found at a point about four hundred and ten feet distant
therefrom, on the south side of the street.  The street, at that
point, is about sixty feet wide.

The assignments of error are six in number, the first of
which relates to instructions given at the instance of the
State; the second, third, fourth and fifth, to the refusal of
the court to permit a witness to answer certain questions; and
the sixth, to the refusal of the court to set aside the verdict
and grant a new trial.

In the interest of clearness, the second, third, fourth and
fifth assignments of error will be disposed of first.  In the
course of the examination of J. R. Clifford, he was asked if
he knew the occasion for Paul Clifford having a revolver on

his person that night; if he had heard any threats communicated to his son by Joseph and Charles Cook; if he had heard any threats communicated to his son that evening from Jennie Cook, the wife of Joseph Cook; and what, if anything, he knew of his own personal knowledge of any threats communicated to his son, made by Joseph and Charles Cook, or either of them, to do him great bodily harm. The court refused to permit the witness to answer any of these questions, but did allow the accused himself to testify to his knowledge of such threats, and then allowed witnesses to contradict him in respect thereto. This evidence was admissible. It is proper to prove communicated threats to shed light upon the mental attitude of the prisoner toward the deceased when the homicide occurred, and for the purpose of explaining the possession of the weapon and establishing justification for carrying it, and thus rebutting any inference of malice which might arise from the fact of its possession on the occasion of its use. *State* v. *Evans*, 33 W. Va. 417; *State* v. *Clark*, 51 W. Va. 457. By way of sustaining the action of the court in refusing to admit this evidence, it is urged that the threats did not emanate from Turner, but only from the Cooks. But as they constituted parts of the series of events which led up to the killing of Turner bearing materially upon the situation of the accused at the time, and are logically inseparable from that event, they could not properly be excluded. The deceased was the father of the child, concerning whom the difficulty arose. He, in company with Jennie Cook, had called upon the accused in the afternoon of that day for an explanation of his conduct toward the child. He was the uncle of Jennie Cook. In consequence of these two relationships of the parties concerned, the accused might well suppose that he felt a deep interest in the controversy and might very naturally participate in any attempt which the Cooks might make upon him. No threat on the part of the accused against any one is proved until after the killing of Turner, and, at the time of the assault upon him, he declined combat and endeavored to avoid it. These facts, accompanied by proof of the previous threats against him, tended to show his possession of the weapon to be consistent with a lawful purpose and to negative any motive of revenge or other ill feel-

ing towards his assailants, or the deceased, which might arise from the possession thereof.

The evidence of communicated threats, although purporting to have been made by Jennie Cook, or all the Cooks, but not by Turner, was admissible for another reason. The evidence of conspiracy among the Cooks is amply sufficient to take the case to the jury on the question, whether they confederated and conspired to injure the accused. *State* v. *Prater*, 52 W. Va. 132. Turner accompanied them from their home toward the place at which the assault was made, very shortly before it occurred, and was found at the place which the evidence indicates was appointed by the Cooks for their rendezvous. He was present while the assault and beating were in progress, and near enough to render assistance. His relation to the Cooks, being the uncle of Joseph Cook's wife, was such as was calculated to make him feel an interest in the matter. He was the father of the child concerning whom the original trouble had arisen. Two witnesses swear that he actually participated in the assault. All these circumstances tend to prove that he had knowledge of the common design and purpose of the Cooks, and, if having such knowledge, he joined in that purpose and design, he made himself their co-conspirator and was as much at fault as the Cooks themselves. The threats previously communicated to the accused, if any, together with the assault, constituted evidence of ground for a reasonable belief on his part that he was then and there the victim of a conspiracy, and, if the deceased joined in the assault, he was their co-conspirator. Upon this evidence, it was the right and duty of the jury to inquire whether the provocation involved in the attack upon the accused was provocation given by Turner as well as by the Cooks. The legal effect of such provocation touches and bears upon the nature of the offense, if the shooting of Turner was intentional, as the testimony of some of the witnesses indicates, and not accidental. The intentional taking of life in hot blood and under excitement, occasioned by sufficient provocation, is not murder, but manslaughter. *State* v. *Beatty*, 51 W. Va. 232. Voluntary manslaughter is the intentional, unlawful and feloneous, but not deliberate or malicious, taking of life. The common law definition of involuntary manslaughter is an unintentional killing, resulting from an unlawful act on the part of the

accused, not amounting to a felony, or from a lawful act, negligently performed. Whar. Hom. sections 4, 5 and 6. As the shot was fired immediately after the assailants of the accused had released him, it was the duty of the jury, upon their oaths and honest belief, from all the evidence, to say, in view of this provocation, if they believed there was a conspiracy of which the accused had knowledge, whether the firing of the shot which killed the deceased was intentional, and, if so, whether it was the result of passion. anger and excitement, occasioned by the assault of the conspirators, and, if so, to return a verdict of guilty of manslaughter. But if, on consideration of all the evidence, they believed the shot was unintentional, they should have acquitted, and if, from all the evidence, they believed the shooting was deliberate and malicious, as well as intentional, their verdict should have been guilty of murder.

Since the degree of the offense, when the killing is intentional and the evidence tends to establish provocation, as known in the law of manslaughter, depends upon the mental condition of the accused, he is entitled to prove all the facts and circumstances that tend to show reasonable ground for belief on his part that the deceased was a party to the assault made upon him. If Jennie Cook had made the threats, and Turner had accompanied her when she came to him to obtain satisfaction and then appeared at the place of the assault with the Cooks, these were circumstances tending to produce belief, on the part of the accused, that Turner had joined them in purpose and design. The evidence of the threats, therefore, became material, although the jury might disbelieve the testimony as to Turner's having joined in the assault. "Where two conspire to kill or inflict grave bodily injury on a third person, and in carrying out this purpose, one of them fires a pistol at such person, who immediately pursues them and kills the one who did not fire the pistol, it is manslaughter." *State* v. *Gaskins*, 93 N. C. 547. To the effect that, in determining the degree of the offense, the jury must consider the knowledge and belief of the accused, as to the attitude of the deceased towards him during the assault, and are not controlled by his actual attitude, see 21 Am. & Eng. Ency. Law 185. "If two be fighting, and another interfere with intent to part them, but do not signify such intent, and

he be killed by one of the combatants; this is but man-
slaughter: for the latter might think that he came in aid of his
opponent, unless he had notice of his real intent." 1 East P.
C. 292. "The statute does not require the actual occurrence
of an insult, either by words or conduct, but it is sufficient
that the accused acted on information given by another, if
he believed it, and the killing was done in consequence of
passion thereby aroused, though in fact no insult had been
given. The homicide must be viewed from the standpoint of
the accused." 21 Am. & Eng. Ency. Law 181.

It has been suggested that failure of the attorneys for the
accused to state to the court, when objection was made to the
questions, what they expected to prove in response thereto,
precludes a reversal for this error. To make such an error
cause of reversal, it is only necessary that the relevancy and
materiality of the evidence offered shall appear. When this
is not disclosed by the nature of the question, it is necessary
that it be made to appear in some other way, and this is
usually done by statements of counsel, showing what he
expects to prove and how it becomes relevant to the issue.
Until a comparatively recent date, there was no suggestion
of necessity for the statement of the anticipated answer of
the witness, when the question, viewed in the light of its
subject matter, the evidence in the case and the issues, dis-
closed its relevancy and materiality. Commencing with *Kay*
v. *Railroad Co.*, 47 W. Va. 467, this Court has, from time
to time, added this requirement, relying for its authority,
for the most part, upon *Childress' Admx.* v. *Railway Co.*,
94 Va. 186; *Ins. Co.* v. *Pollard,* 94 Va. 146; *Kimball* v. *Car-
ter*, 95 Va. 77, and *Railway Co.* v. *Reiger*, 95 Va. 418. It
is asserted in *Sesler* v. *Coal Co.*, 51 W. Va. 318, and *Thomas*
v. *Electrical Co.*, 54 W. Va. 395. In the older Virginia
decisions, having binding authority upon this Court, this
requirement is not found. In *Carpenter* v. *Utz*, 4 Grat.
270, the court say it must appear, from a statement of the
evidence offered and excluded, that error has been commit-
ted, in order to reverse a judgment; or, if its relevancy de-
pends upon other facts in the cause, the party alleging the
error, should present such a case on the record as shows the
relevancy of the evidence rejected. They further say testi-
mony which does not appear of itself, or upon the facts

stated in the record, to have been relevant, will be held in the appellate court to have been properly excluded. In that case the court undoubtedly heard the evidence offered and then passed upon its relevancy. It did not refuse to allow the party to disclose by his witness what he desired to prove. In other words, it did not sustain objections to proper questions asked, nor is there anything in the opinion which, in any degree, sustains the position that the court may refuse to permit a witness to answer a question, which, on its face, discloses the relevancy and materiality of its subject matter. *Johnson* v. *Jennings*, 10 Grat. 1, 60 Am. Dec. 323, only requires the bill of exceptions to show relevancy of the excluded evidence; and an examination of the opinion discloses that the evidence was before the court, but there was nothing in it from which the court should see that it was relevant. Those parts of the syllabus and opinion which say the bill of exceptions must show the answer of the witness, as well as the question, relate to the admission of alleged improper evidence. Of course, where evidence has been admitted, the court cannot say it is prejudicial without knowing what it is. That is the ruling in *Beirne* v. *Rosser*, 25 Grat. 537. This Court held the same in *Nease* v. *Capehart*, 15 W. Va. 299. This rule is invariable in all courts. *Mays* v. *Deaver*, 1 Ia. 216; *Speers* v. *Fortner*, 6 Ia. 553; *Mosier* v. *Vincent*, 34 Ia. 478; *Willey* v. *Hall*, 8 Ia. 62; *Campbell* v. *Chamberlain*, 10 Ia. 337; *Hanan* v. *Hale*, 7 Ia. 153; *Howard* v. *Patrick*, 43 Mich. 121; *Somerville* v. *Richards*, 37 Mich. 299; *Lawrence* v. *Com.*, 86 Va. 573; *Smith* v. *Ins. Co.*, 60 Vt. 682; *Carpenter* v. *Corinth*, 58 Vt. 214. In this class of cases, the party loses the benefit of his exception by no improper action of the court, but by his own failure to have a record made of what transpired. *McDowell's Exr.* v. *Crawford*, 11 Grat. 377, decided by a divided court, held it error in the trial court to refuse to permit a witness to be recalled and to have produced certain books which had never been tendered as evidence in the court below, but the nature of the contents of which had been disclosed by oral testimony.

In *Gunn* v. *Railroad Co.*, 36 W. Va. 165, this Court said: "Where the form of the question propounded to the witness on the stand indicates, of itself, that it is framed and intended to elicit in reply something said at the time and place of the

accident as part of the *res gestae, held,* it is error to refuse the question, but the answer should be heard or seen, and then its competency passed upon." This has never been overruled by any express reference to it. In *Jackson* v. *Hough,* 38 W. Va. 236, it is recognized and the two cases distinguished in the following language: "This question does not itself, like that in *Gunn* v. *Railroad Co.,* 36 W. Va. 165 (14 S. E. Rep. 465,) import proof of anything but that single fact, which itself would be immaterial." The question in *Jackson* v. *Hough,* related to an isolated fact, which, without other evidence connecting it with the issue, would have been irrelevant. The ground of its exclusion was not failure to say what the answer would be, but want of anything in the question to show its materiality. The distinction marked in *Jackson* v. *Hough,* seems to have been lost sight of in *Kay* v. *Railway Co.,* 47 W. Va. 467, where the syllabus in the former is quoted as importing that the answer must be given in order to show materiality, when the question is itself disclosed. Then that case is followed by the other late cases to which reference has been made. The result is that we have two rules, in consequence of which it becomes necessary to determine which is the correct one.

Many cases from other states hold that, in order to make an exception to the action of the court in refusing to allow a witness to answer a question, the record must show what the answer would have been, if permitted. See *Spaulding* v. *Jennings,* 173 Mass. 65; *Springer* v. *Pritchard,* 22 Nev. 313; *McGowan* v. *Railroad Co.,* 95 N. C. 417; *Railroad Co.* v. *Cheek,* 152 Ind. 663; *Paddleford* v. *Cook,* 74 Ia. 433; *Small* v. *Navigation & Mining Co.,* 40 Me. 274; *Sullivan* v. *Schultz,* 22 Mont. 541; *LeMay* v. *Brett,* 81 Minn. 506; *Kraxberger* v. *Roiter,* 91 Mo. 404; *Fire Ins. Co.* v. *Berg,* 44 Neb. 522; *Hummel* v. *The State of Ohio,* 17 O. St. 628; *Railroad* v. *Stonecipher,* 95 Tenn. 311; *Felker* v. *Grant,* 10 S. D. 141; *Avery* v. *Wilson,* 47 S. C. 78; *Roach* v. *Caldbeck,* 64 Vt. 593. After careful consideration of *Carpenter* v. *Utz* and *McDowell's Exr.* v. *Crawford,* I am convinced that they are not in conflict with this rule. In the former, the excluded evidence appeared in the record. It was not a case of refusing merely to allow a proper question to be answered. In the latter, the offered evidence was documentary, and the

record disclosed its existence and character. *Gunn* v. *Railroad Co.* is the only Virginia or West Virginia case enunciating the rule therein stated. As authority for it, *Scotland Co.* v. *Hill*, 112 U. S. 183, was cited. At that date, it seemed to be about the only case of its kind. As the opinion was delivered by Chief Justice Waite, it was entitled to great respect, although he cited no precedent or authority for it, and admitted that other courts had held to the contrary. In *Patrick* v. *Graham*, 132 U. S. 627, the opposite rule was rigidly enforced. The only other case found, sustaining *Gunn* v. *Railroad Co.*, is *Commissioners* v. *Gantt*, 78 Md. 286. The late decisions of this Court are all the other way. In addition to cases already cited, see *Snooks* v. *Wingfield*, 52 W. Va. 441, 448; *Williams* v. *Belmont &c. Co.*, 55 W. Va. 84. This accords with the great weight of authority everywhere. 2 Cyc. 1045; 3 Cyc. 165, citing numerous cases; Elliott App. Pro. §§ 743 and 744. In view of this vast array of authorities, we are bound to say that, if *Gunn* v. *Railroad Co.* has not been already overruled, as regards this question of practice, it must now be disapproved and declared to be not law in this State. Error must affirmatively appear in order to reverse. It cannot, in any case, be presumed. To reverse this judgment for refusal to allow these questions to be answered, it would be necessary to assume that the witness could have answered them favorably to the accused. That, the Court cannot do, however unfortunate the result may be.

The first instruction complained of set forth six forms of verdict: guilty of murder in the first degree without recommendation, guilty of murder in the first degree with recommendation of imprisonment, guilty of murder in the second degree, guilty of voluntary manslaughter, guilty of involuntary manslaughter and not guilty, and told the jury that, under the indictment, they could return any one of said verdicts. Instructions Nos. 2. 3 and 4 are as follows:

2. "The Court instructs the jury that to constitute a willful, deliberate and premeditated killing, constituting murder of the first degree, it is not necessary that an intention to kill should exist for any particular length of time prior to the actual killing; it is only necessary that said inten-

tion should come into *existance* for the first time at the time of such killing, or any time previous.

3.   "The Court instructs the jury that where a homicide is proved, the presumption is that it is murder in the second degree.   If the State would elevate it to murder in the first degree she must establish the characteristics of that crime, and if the prisoner would reduce it to manslaughter, the burden is on him.

4.   "The Court instructs the jury that a man is presumed to intend that which he does, or which is the immediate or necessary consequence of his act; and if the jury believes from the evidence in this case that Paul Clifford, the prisoner, with a deadly weapon in his possession, without any, or upon a very slight provocation, gave to the deceased, Jacob Turner, a mortal wound, then the said Paul Clifford is *prima facie* guilty of willful, deliberate and premeditated killing and the necessity of proving extenuating circumstances is thrown upon the prisoner; and unless the prisoner has proved such extenuating circumstances, or such circumstances arise out of the case made by the State, the jury must find the *ptisoner* guilty of murder in the first degree."

The objection to instruction No. 1 is that it contains no reference whatever to the evidence.   Failure to qualify it by saying that, in order to return any one of said verdicts, the jury must believe the defendant guilty of the offense named in the verdict, is the basis of criticism.   The court, no doubt, intended nothing more than to advise the jury as to their power, if, from the evidence, they believed the defendant guilty of any one of the offenses charged in the indictment, to find accordingly.   The other instructions given for the State do not supply this defect, if defect it be, by saying any verdict the jury should find must rest upon their belief from the evidence, but, in the instructions given for the defendant, three in number, the attention of the jury is specifically and repeatedly directed to the requirement of the law that their verdict must rest upon the evidence and their belief therefrom of the guilt of the accused beyond a reasonable doubt.   Though instruction No. 1, standing alone and unaided by other instructions, might be erroneous, it is correct as far as it goes, and the defect in it having been

supplied by other instructions, the defendant cannot be deemed to have been prejudiced or injured thereby. A similar instruction was given in *State* v. *Prater*, 52 W. Va. 132, 154, and an assignment of error was predicated thereon, but the Court refused to disturb the verdict on account thereof. If an instruction correctly states the law as far as it goes, and is defective only in failing to state all that should be said in reference to its subject matter, the court commits no error in giving it, provided the defect is supplied by another instruction given. *State* v. *Clark*, 51 W. Va. 457, 462; *State* v. *Prater*, 52 W. Va. 132.

The last clause of instruction No. 2, relating to the element of intent in the crime of murder, says "It is only necessary that said intention should come into *existance* for the first time at the time of such killing, or any time previous." The existence of such intent at the time of the killing is a necessary ingredient of crime, and it is clearly not enough that the prisoner intended such purpose at some previous time. The jury must be satisfied beyond a reasonable doubt that though he entertained such purpose before the killing, it must have continued and moved him in the act of the killing. The instruction correctly quotes the law as laid down in *Wright's Case*, 33 Grat. 890, and approved in *State* v. *Morrison*, 49 W. Va. 210, 217, and, no doubt other cases decided by this Court. But, in these decisions, it is given as abstract law, addressed to the legal profession, and not as a formula for the guidance of a jury of laymen in the trial of a case, and is not as accurate as it might be for that purpose. However, it seems to have been deemed, by the prisoner and his counsel as well as by the attorney for the state, unnecessary to advise the jury of the necessity of the existence of criminal intent at the very moment of the killing. Two instructions relating to the element of intent were given at the instance of the accused, in neither of which was the attention of the jury directed to this point. The irresistible inference is that it was so plainly and palpably obvious to the jury as to render such action useless. The plain object of the instruction is set forth in the first clause thereof. It was to relieve the jury of any difficulty they might encounter from finding that the conception of a design to kill and the act of killing were contemporaneous. The

last clause pursues the same object. It relates to the time of forming the intent, assuming it to have continued until the time of the killing. This is the plain sense and meaning of the instruction, and the court cannot assume that a jury of reasonable and prudent men would probably be mislead by it. A judgment cannot be reversed except for some act of the court which may have prejudiced the party complaining. Though there be inaccuracy of statement of an instruction, it does not amount to an error, unless it is calculated to mislead the jury and may have done so, and did, for aught that the Court can see. In determining whether it may have had such effect, the Court must view the language as having been addressed to men of, at least, average intelligence. There is no other standard by which to test it. So viewing this instruction, we are unable to say it could reasonably have had such effect, and it is evident that counsel on both sides, looking at the instruction from the same point of view, having the advantage of personal presence at the scene of the trial, knowledge of the jurors, the tenor and course of the argument and all that transpired before the jury, were of the same opinion. Therefore, we hold that no error was committed in giving it.

The objection to instructions 3 and 4 are substantially the same as were urged against them in the case of *State* v. *Taylor*, (50 S. E. 247), 57 W. Va. 228. A further contention against the propriety of these instructions is the lack of evidence that the accused was the aggressor, or in any way in fault, at the time the assault was made upon him, and the presence of evidence tending to show that the discharge of the pistol was accidental and unaccompanied by any criminal intent. After a careful inquiry as to the propriety of giving such instructions, this Court declared in *State* v. *Taylor*, as follows: "When the state of the evidence in a criminal case tends to prove facts, from which presumption of guilt arise, under rules of evidence, established by a long and uniform course of judicial determination, the trial court may properly bring them to the attention of the jury by instructions, aptly and correctly stating them. Such instructions, if properly framed, neither assume the existence of the facts, from which the presumptions arise, nor interfere with the province of the jury as to the weight of the evidence." Their application

therefore, depends upon the state of the evidence. If there is any evidence tending to prove the offense of murder of the second degree and murder of the first degree, the court did not err in giving these instructions. Upon one view of the evidence, its tendency is to prove the Cooks to have been the only actors and Turner an innocent bystander. Certain witnesses testify that he stood at the place at which he was found dead, from the beginning, until the end, of the affray, with his hands in his pockets, and one witness at least says his hands were still in his pockets when found dead. If he did not participate in the assault, as stated by the accused and another witness, the evidence as to his connection with the conspiracy is purely circumstantial. One witness testifies that the accused, after rising, took one step toward the deceased, stopped, looked at him a minute and then fired. The testimony tending to prove these things as circumstances constitutes evidence of intentional, deliberate and malicious shooting, although the jury must, in the same connection, consider whether the accused had reasonable ground to believe, and did believe, the deceased was a co-conspirator and present as an aider and abettor, but taking no actual part in the assault, in order to determine whether the accused is guilty of anything more than manslaughter. It therefore affords foundation and justification for the giving of these instructions. Other instructions in the case present other and different theories, founded upon different and conflicting tendencies of other portions of the testimony and circumstances shown. In determing what instructions shall be given the court does not consider the weight of any evidence. It simply lays down rules for the analysis and application thereof by the jury. It is enough that there is evidence appreciably tending to prove or establish a certain theory of a case, however slight the degree of its weight. And a court need not withhold an instruction for paucity of evidence, if there be any, tending, in any appreciable degree to establish the hypothesis embodied in the instruction. In *Hopkins* v. *Richardson*, 9 Grat. 485, Judge Lee, speaking for the court, said: "In a plain case of a total absence of evidence tending to make out the supposed case, the court may well refuse to give any instruction based upon it. But where there is such evi-

dence, of however little weight it may appear to the court, or however inadequate in its opinion, to make out the case supposed, it is best and safest for the court not to refuse to give the instruction asked for, if it propound the law correctly." See also *Early* v. *Garland's Lessee*, 13 Grat. 1; *Honesty* v. *Commonwealth*, 81 Va. 283; *Fire Association* v. *Hogwood*, 82 Va. 342. Certain decisions of this Court may seem to be in conflict with the above quoted doctrine of the early Virginia decisions. Certain it is that some general expressions used in them indicate deviation from the rule declared by them. *Bloyd* v. *Pollock*, 27 W. Va. 75, holds that a court should not give an instruction based upon an hypothesis, though supported by some evidence, if the evidence is so weak that the court would set aside a verdict based thereon. *State* v. *Belknap*, 29 W. Va. 427, says the evidence must fairly tend to prove the facts upon which the instruction is based. *Parkersburg Industrial Co.* v. *Schultz*, 43 W. Va. 470, holds that the hypothesis embodied in the instruction must be fairly presented by the evidence. *McDonald* v. *Cole*, 46 W. Va. 186, holds that the evidence must fairly present the hypothesis and be sufficient to sustain a verdict predicated thereon. No authority whatever is cited in the first three of the above decisions for the propositions asserted in them. The last one cites *Bloyd* v. *Pollock*, and *Industrial Co.* v. *Schultz*. In *Carrico* v. *Railroad Co.*, 39 W. Va. 86, the ruling in *Bloyd* v. *Pollock*, was virtually condemned and those of the early Virginia cases above cited approved to this extent, that this Court will not reverse because the court below gave an instruction predicated upon evidence "though that evidence be very weak in the opinion of this Court." *Carrico* v. *Railroad Co.* would be sufficient authority for refusing to disturb the verdict on account of the giving of instructions 3 and 4, as not having been based upon sufficient evidence. But a new trial is allowed on another ground and the case must go back. Therefore, this Court must say whether it is the duty of the trial court to determine, in passing upon the propriety of the instruction complained of, to weigh the evidence and see whether it will sustain the hypothesis presented by the instruction. To so hold would put it in the power of the court to take any case from the jury, when the evidence

on one side seems to be too weak to sustain a verdict in favor of that side, and this, without any motion or application for such action by either of the parties. Since the parties are content to proceed in the exercise of their constitutional right of trial by jury, however weak their respective cases may be, it seems that an interference by the court, upon its own motion, would be a virtual denial of such right. Until the court is asked to interfere, its duty is merely to preside over the trial by the jury. Decision after decision says the weight of the evidence during the progress of the trial, and until after verdict, is for the jury and not the court, and any instruction or other action of the court, invading the province of the jury, by direction as to the weight of the evidence, is cause of reversal. After verdict, when the jury has completed its work and the parties have had the benefit of the constitutional guaranty, the function of the court begins, upon a motion to set aside the verdict for insufficiency of evidence. The law regards jurors as being better calculated to weigh evidence than judges. A suitor may prefer the judgment of twelve men upon the weight of his evidence to that of one man upon the bench, and, however, weak or strong his case may be upon the evidence, he has the right to proceed with it before the jury until, upon some proper application, such as a motion to direct a verdict, a motion to exclude evidence, or a demurrer to the evidence, the court has no right to interfere. The cases which seem to be in conflict with this view are only so in the generality of the expressions used in the syllabi and opinions. An analysis of the evidence shows that it did not really tend, in any appreciable degree, to sustain the hypothesis stated in the instructions. In some of them, there was none. "It is not for the court, in ruling upon evidence, or in framing instructions, to determine the probative force of evidence. If the evidence is material, relevant, and competent, it is for the jury, and instructions bearing upon the evidence, without respect to its weight or credibility, cannot be deemed irrelevant. Accordingly, an instruction cannot be deemed erroneous if there be any evidence on which to base it, no matter how slight and inconclusive that evidence may be." 11 Enc. Pl. & Pr. 181, citing decisions from Alabama, Arkansas, Georgia, Illinois, Indiana, Iowa, Missouri, Nebraska, Ohio, South

Carolina,, Texas and Virginia.    The very excellent work just quoted from qualifies this only to the extent of saying an instruction should not be given upon evidence which raises at the most a mere conjecture, nor upon evidence which is so slight as to amount merely to an assumption. Nowhere does it state that the evidence to warrant an instruction must be sufficient to support a verdict founded upon it.    This constitutes no exception to, or qualification of, the general rule above stated, and that rule seems to be universally observed, except in the general expressions found in some of the decisions of this Court and heretofore referred to.

Freedom from fault on the part of the accused, at the inception of the assault upon him, is a circumstance in his favor on the issue as to whether he is guilty of any offense graver than that of manslaughter, but it is clearly not conclusive in his favor, and, therefore, does not preclude the giving of instructions predicated upon the theory of murder. One who is attacked without cause, and having the greatest provocation, may nevertheless be guilty of murder. "Where the killing, although intentional, is done in passion, in heat of blood, upon sudden provocation by gross indignity, out of tenderness for the frailty of human nature, the law reduces the offense to manslaughter, but, however great the provocation may have been if there has been sufficient time for passion to subside and for reason to return, the homicide is murder." State v. Beatty, 51 W. Va. 232; Mc Whirt's Case, 3 Grat. 594; Whar. Hom. 448. The time intervening between the cessation of the beating and the firing of the shot which killed the deceased was very short, according to all the testimony, but there was an intervening period, and whether there was sufficient time for reason to regain its sway, depends upon other circumstances, such as the temperament of the accused, the nature of the provocation, his surroundings, etc., as well as lapse of time. Whar. Hom. section 449. Another element entering into the case is, whether there was any provocation on the part of the deceased, within the meaning of the law, a matter concerning which a good deal has been said herein.

Does the defense of accidental killing render these instructions improper? It is urged, upon the authority of State

v. *Cross*, 42 W. Va. 253, that it does. The theory upon which the majority of the Court reached a conclusion in that case is made very plain by the opinion. They said "There was no evidence of premeditated or intentional killing." If not, no instructions based upon such theory could properly be given and every instruction that presented any hypothesis of guilt of such offense was held improper. In the course of the opinion, want of evidence is repeatedly adverted to, and on page 257, it is said: "This instruction was improper, in this case, for the same reason that all the others were improper." This case, as practically all others, presents a number of issues and theories. Some of them are inconsistent necessarily. If they were not, there could be but one view of the case. The defendant himself presents inconsistent theories, and has a perfect right to do so, and it is the duty of the jury to adopt that one, whether presented by the State or the prisoner, which, upon their oaths, they believe, beyond a reasonable doubt from the evidence, to be the true hypothesis. A proper instruction upon one theory should not be refused because it is inconsistent with a proper instruction based upon another. What modification of the two instructions here under consideration would be necessary to keep before the jury, without the aid of any other instruction, the defense of accidental killing? Nothing more than to insert in instruction No. 3 the word "intentional" before "homicide", and in No. 4 the word "intentionally" before the word "gave." If this had been done, what basis would there be for the contention against the propriety of these instructions? Absolutely none that could be founded upon their language or terms. Not a word in these instructions countenances the view that the killing would be murder in the absence of the element of intent. They assume nothing except that the jurors, as intelligent men, know that acccidental killing is not criminal. Two instructions given for the defendant impressed upon the jury in the strongest terms the necessity of the existence of intent, on the part of the accused, to kill the deceased, as a prerequisite to their finding him guilty of any offense. All these instructions taken together, and the jury had them all before them at the same time, cannot be so read as to leave the jury without instruction or guidance on the ques-

tion of intent; nor, when read together, is there any contra-
diction in their meaning, though there may be a techincal
one in terms. "The instructions given to the jury must be
taken together; and it is not necessary to insert in each sep-
arate instruction all the exceptions, limitations and conditions
which are inserted in the instructions as a whole." *State* v.
*Dodds*, 54 W. Va. 289. "Instructions to the jury must be
taken and read as a whole, and, if, upon being so read and
construed, they state the law correctly, and do not misstate
it in any particular, and no proper instruction, asked for, has
been refused, the verdict will not be disturbed on the ground
that additional proper instructions could have been given,
or that some particular instruction, standing alone, might
tend to mislead the jury." *State* v. *Kellison*, 56 W. Va.
690.

A motion made to the court for a new trial on the ground
of insufficiency of evidence, presents an entirely different
question from that which arises upon a request for an in-
struction. Upon such motion the court has more extensive
powers to deal with the evidence. The jury trial is complete.
The function of the jury has been performed and that of the
court begins. By his motion, the accused appeals from the
decision of the jury to the court on a question of law. He
prays the judgment of the court as to whether the evidence
upon which the jury has founded its verdict is sufficient in
law to sustain it. By his own act, he brings the question
before the court. In entertaining this motion the court does
not officiously meddle with the province and function of the
jury, or the rights of parties, respecting jury trial; but
simply takes under advisement and consideration the legal
question presented, and, after argument and mature consid-
eration, disposes of the motion. In this way, all confusion
in, and danger of prejudicing, the jury trial, by hasty and
ill-considered rulings, are avoided. In sustaining a motion
to set aside a verdict on this ground, the court does not undo
anything the jury has legally performed. It simply restores
to the party what the jury, in contemplation of law, has de-
prived him of, or withheld from him. It is in no sense a
re-trial of the case by the court, on the evidence, as the jury
tried it. The court merely ascertains, from all the facts
which were found by the jury, or could have been found,

whether the elements necessary to make out title to the right in action, or to constitute the crime charged are shown, and then declares the law accordingly.

It was held in *State* v. *Henry*, 51 W. Va. 283, that in criminal cases, the court, in passing upon a motion for a new trial, will reject all conflicting oral evidence of the exceptor and give full faith and credit to that of the adverse party, as was formerly done in civil cases. Whether there is any reason for discriminating between civil and criminal cases in this respect, it is not necessary to determine now; for nothing presented by the evidence in this case would produce a result, under the operation of the new rule, different from that which is produced by the application of the old one. Having disregarded the conflicting oral evidence, adduced on behalf of the accused, it still appears that there was gross provocation to the accused, growing out of the transaction between him and the son of the deceased. The deceased was present at the assault and the accused knew the relationship existing among all these parties, as well as the purpose for which the Cooks had accosted him. As Turner was present, it is not to be assumed that the accused did not know he was there. Therefore he had resonable ground for believing that the purpose of this assemblage was to inflict bodily injury upon him. This was done in a most unequal contest, as regards physical strength, two men assailing one. For the purposes of this inquiry, it must be assumed that the fatal shot was intentionally fired toward the deceased. If the shooting had occurred during the progress of this fight, the jury could not have said, without disregarding the evidence, that the accused was not then in a high state of passion and excitement, such as to preclude a finding of deliberate shooting. It did not occur until after his assailants had left him, but it did occur immediately after. J. T. Carter, one of the witnesses for the State, says: "He made about one step towards Jake and then shot." On cross-examination, the same witness said the accused had fired "Just as quick as he could get himself together." Robert Spears made the following statement in answer to a question: "Why Paul made one step toward Jake and he looked at him for about a minute and he fired." On cross-examination he said: "Paul made one step towards Jake and shot." This is all the

evidence that could be regarded as tending to show time for the subsidence of passion. According to Carter's testimony, there was no act on the part of the accused indicating reflection. The other witness's testimony is very indefinite. "About a minute" is absolutely devoid of any certainty, for it is a phrase very commonly used to denote a mere point of time and not the lapse of any certain period. This testimony rather implies that there was a halt, as if for deliberation, before the firing of the fatal shot, but it is wholly uncertain as to the purpose. It all occurred in the darkness of night. Was it for deliberation or for the purpose of locating the man who had been beating him? However this may be, it was almost imperceptible, and indicated no departure from the struggle which had preceded it. There was no turning aside to some other and distinct matter, such as a social or business transaction, indicative of relaxation of the passion which confessedly had dominated the mind of the accused up to that point. This is too slight to sustain a finding of such subsidence or relaxation.

In *State* v. *Beatty*, 51 W. Va. 232, it was held that, "When time has intervened between the date of provocation and the date of the killing, the question whether the killing was done in the heat of blood is for the jury." The application of this law requires evidence of the lapse of some period of time within which the jury might deem it reasonable to say either that reason had regained her sway, or, if not, it is reasonable to suppose that the accused had nursed and fed his anger and deliberately kept it alive. What is the rule where there has been no such lapse of time? Is the question of intent one for the jury under all circumstances, without regard to the existence or non-existence of a "cooling period?" It is often said by the authorities that intent is a question of fact, the determination of which is peculiarly within the province of the jury. It is to be observed, however, that this most frequently occurs in the discussion of the action of the court in giving or refusing instructions. As has been indicated, these rulings are made without reference to the weight or probative force of the evidence, and the declarations made by the courts of review, respecting them, are not applicable, when it is the duty of the court to deal with the weight of the evidence. A great many decisions hold that it is the duty

of the court to grant a new trial when the facts disclosed by the evidence are not such as to justify the finding of the jury. Is it true that in every case in which it appears that the accused has taken the life of his fellow-man, and the jury has found him guilty, after weighing the evidence under proper instructions by the court, neither the trial court nor the appellate court can grant a new trial because the question of intent is, under all circumstances, one of fact for the jury? The authorities answer this in the negative. In numerous instances, convictions of murder have been reversed because the evidence did not justify them. *Guilford* v. *State*, 24 Ga. 315; *Thompson* v. *State*, 1 Tex. Cr. Rep. 1: *State* v. *Brown*, 15 Rich. (S. C.) 59; *People* v. *Kohler*, 49 Mich. 324; *Hayward* v. *People*, 96 Ill. 492; *Holly* v. *The State*, 29 Tex. 141; *Leake* v. *The State*, 29 Tex. 144; *Ake* v. *The State*, 31 Tex. 416; *Harris* v. *The State*, 36 Ark. 127; *Miller* v. *The State*, 74 Ind. 1; *Petty* v. *The State*, 65 Tenn. 610; *Brown* v. *The State*, 7 South. R. 359.

The better opinion seems to be that in criminal, as well as civil law, there are certain limits within which the jury must be confined. They cannot find the elements of murder or any other offense when the evidence wholly fails to establish them. That a grievous provocation immediately resented with violence, resulting in death, reduces the offense from murder to manslaughter, is a rule of law, seems to be asserted by all the books. In *McWhirt's Case*, 3 Grat. 594, the court entered upon a long and laborious analysis of the evidence, on the motion for a new trial, for the purpose of determining whether sufficient time had elapsed between the provocation and the killing to allow the passion of the accused to subside. Had it been a mere question for the jury and not for the court, why did not the court dispense with such a useless performance as a review of the evidence on the motion for a new trial? Though this Court has not, in many instances, if any at all, set aside verdicts in cases of homicide, because of insufficiency of evidence, the decisions do not deny to it the power to do so in any case in which it ought to be done. In *State* v. *Scott*, 36 W. Va. 704, this Court said: "It is quite true that the fatal blow struck by the prisoner with an unlawful weapon of deadly character was given in what might be termed a chance med-

ley or affray, which occurred in an unpremeditated manner. If the prisoner had been able to prove that he himself was entirely blameless in the quarrel which thus fatally resulted, and that his assailant was bent upon inflicting great bodily harm, these circumstances ought to have reduced his offense to manslaughter. But the evidence of the State would seem to justify the jury in concluding that the prisoner started the quarrel by very boisterous and unseemly behavior, where the deceased and his companions, including two women, were engaged in drinking beer; that, when asked to desist, the prisoner retorted with foul and abusive epithets, and that he thus provoked the quarrel, and concluded it by throwing a two-pound iron weight with deadly aim at his antagonist, who could not have been distant from him more than eight or ten feet. Furthermore, he himself in his testimony, states that before throwing it he 'steadied' himself; and further evidence of the State tends to show that he must have advanced two or three steps toward his adversary. The commencement of the quarrel by him, and the violence of his resentment out of proportion to the provocation, tended to prove that malignity of disposition which the law defines to be malice towards mankind.'' The principle here asserted is that a homicide on a gross provocation is manslaughter only; but the prisoner put himself beyond that rule by provoking the quarrel, inducing a provocation to himself and resenting it by means wholly disproportionate to the injury thus brought upon himself. This conduct shed light on the intent. In *State* v. *Clark*, 51 W. Va. 457, the Court refused to set aside a verdict of murder, where the killing had resulted from a quarrel or controversy, but it was expressly held that the deceased had not done any act which the Court could say, as matter of law, amounted to such provocation as would reduce the offense from murder to manslaughter. It was, therefore, a question for the jury. In other words, there was evidence sufficient to sustain the verdict.

In *Rex* v. *Ayes*, R. & R. 166, the twelve judges of England, in the year 1810, on a question reserved by the trial court, expressly decided that the question of malice is not one solely for the jury. The syllabus of the case briefly states the decision and facts of the case as follows: ''After mutual blows between the prisoner and the deceased, the

prisoner knocked the deceased down, and, after he was upon the ground, stamped upon his stomach and belly with great force. Held manslaughter only.'' The statement of the case shows that the prisoner had first pushed the deceased down on his back, after which the latter arose and struck the prisoner two or three times with his fist. Then the prisoner pushed him down again on his back, and, as he lay there on his back, gave him two or three stamps with great force with his right foot, and after he had gotten up, kicked him in the face. The jury found the prisoner guilty of murder, and the judges, on a question reserved, ordered the verdict set aside. In Wharton on Homicide, at section 446, the following is stated as sound law: ''In an English case, given by Lord Hale, A. and B. were walking together in Fleet Street, and B. gave some provoking language to A., who thereupon gave B. a box on the ear, upon which they closed, and B. was thrown down, and his arm broken. Presently B. ran to his brother's house, which was hard by; and C., his brother, taking the alarm, came out with his sword drawn, and made towards A., who retreated ten or twelve yards; and C. pursuing him, A. drew his sword, made a pass at C., and killed him. A. being indicted for murder, the court directed the jury to find it manslaughter, not murder, because it was upon a sudden falling out, not *se defendendo*, partly because A. made the first breach of the peace by striking B.; and partly because, unless he had fled as far as might be, it could not be said to be in his own defence; and it appeared plainly upon the evidence that he might have retreated out of danger, and that his stepping back was rather to have an opportunity to draw his sword, and with more advantage to come upon C, than to avoid him; and accordingly, at last, it was found manslaughter.'' Another illustration appears in Wharton on Homicide in section 454, which reads as follows: ''Upon an indictment for murder, it appeared that the prisoner and the deceased, who had been upon terms of intimacy for three or four years, had been drinking together at a public house till about twelve o'clock at night; about one they were together in the street, and had some words, and a scuffle ensued, during which the deceased struck the prisoner in the face with his fist, and gave him a black eye. The prisoner called for

police, and, on a policeman coming, went away; he, however, returned again, between five and ten minutes afterwards, and stabbed the deceased with a knife on the left side of the abdomen; the knife, a common bread and cheese knife, was one that the prisoner was in the habit of carrying about with him, and he was rather weak in his intellect, but not so much as not to know right from wrong. Lord Tenterden, C. J.: 'It is not every slight provocation, even by a blow, which will, when the party receiving it strikes with a deadly weapon, reduce the crime from murder to manslaughter; but it depends upon the time elapsing between the blow and the injury; and also whether the injury was inflicted with an instrument at the moment in the possession of the party, or whether he went to fetch it from another place. It is uncertain, in this case, how long the prisoner was absent; the witness says from five to ten minutes, according to the best of his knowledge. Unless attention is particularly called to it, it seems to me that evidence of time is very uncertain; the prisoner may have been absent less than five minutes; there is no evidence that he went anywhere for the knife. The father says it was a knife he carried about with him; it was a common knife, such as a man in the prisoner's situation in life might have; for aught that appears he might have gone a little way from the deceased and then returned, still smarting under the blow he had received. You will also take into consideration the previous habits and connection of the deceased and the prisoner with respect to each other; if there had been any old grudge between them, then the crime which the prisoner committed might be murder. But it seems they had been long in habits of intimacy, and on the very night in question, about an hour before the blow, they had been drinking in a friendly way together. If you think there was not time and interval sufficient for the passion of a man, proved to be of no very strong intellect, to cool, and for reason to regain her dominion over his mind, then you will say the prisoner is guilty only of manslaughter. But if you think the act was the act of a wicked, malicious, and diabolical mind (which, under the circumstances, I should think you hardly would), then you will find him guilty of murder."

It may be supposed that the uncertainty in the evidence as

to whether the prisoner fired at the deceased, thinking him to be Charles Cook, who, just about that time, ran in the direction of the deceased, or fired, knowing the party to be the deceased, constitutes an insuperable obstacle to the reversal of this judgment. If the accused fired at Cook in a transport of passion, and, by mistake, killed Turner, many cases, holding that the degree of the offense would be the same as it would have been had Cook been killed, are to be found among the reported decisions. "And so in cases where the blow intended for one person by accident falls upon and kills another, the thing done follows the nature of the thing intended to be done, and the guilt or innocence of the slayer depends upon the same considerations that would have governed had the blow killed the person against whom it was directed. Hence the homicide is murder, or manslaughter, or excusable homicide, for precisely the same reasons that would have determined its character had the event conformed to the intent; and the principle is the same whether the misadventure proceeded from the misdirection of the blow or from a mistake in the identity of the victim." 21 Am. Eng. Ency. Law 105, citing a number of decisions which fully sustain the text. See also 1 Bish. Cr. Law, section 334; *Plummer* v. *State*, 4 Tex. App. 310; *Aaron* v. *State*, 31 Ga. 167.

If the accused knew he was shooting Turner, as is indicated by the testimony of the two witnesses whose testimony has been quoted, the conclusion must be the same, for he had reason to believe that Turner was a party to the conspiracy and was present for the purpose of aiding and abetting the assault made upon him. He knew the relations existing between Turner and the Cooks, and that the assault was the result of the transaction which had taken place between himself and Turner's little boy. The trouble had all grown out of that incident. Jennie Cook had become involved in it, and all the parties concerned were together at the time and the place of the assault. The trivial, insignificant affair had been developed by them, the Cooks and Turner, as their presence indicated, into a sort of family feud against the accused, and all were present for the purposes of visiting, or seeing visited, upon him, a very severe chastisement. Under these circumstances, the jury were bound to find that the

accused was justified in regarding the provocation as having emanated from all of them, or to disregard the evidence and make an arbitrary finding. The prisoner knew himself to be the victim of a conspiracy. Turner had stood by and seen him assaulted by two men, on account of a matter which had its origin in the transaction between himself and the son of Turner. They were all related. He knew, too, that Turner, had been displeased on account of that matter and had consorted with Jennie Cook concerning it. They had come together to him about it. A reasonable view from the standpoint of the prisoner at the time, was that Turner was a party to the conspiracy, and the jury had no right to proceed upon a fanciful theory, having no basis in the evidence.

In view of these principles and conclusions, we think the evidence is not sufficient to sustain a conviction of murder in the second degree, nor of any offense greater than voluntary manslaughter, and that the circuit court erred in refusing to set aside the verdict. The judgment will, therefore, be reversed and the verdict set aside and the case remanded for a new trial.

*Reversed.*

BRANNON, JUDGE, (*dissenting*).

I dissent because the court reverses only because the evidence is not, in its opinion, strong enough to support the verdict. It thus assumes the office of a jury — or rather takes from a jury its functions. I cannot conceive that this case presents, in this point, a question of law. It is purely a question of fact under evidence. Two witnesses say that the accused, when the Cooks had left him, and were running away, looked at Turner standing ten feet away and fired upon him, while standing with his hands in his pockets. One says the accused looked at Turner a minute and fired. The accused and his father deny this. They do not deny that Turner was ten feet away; but the father says the accused fired as he was in the act of rising from the ground. Here is conflict. There is no conflict as to the exact position of Turner when shot. Nobody says he was beating the accused when shot. This is a critical point in the case. On it turns the degree of the crime, whether murder or voluntary manslaughter. Some evidence says that Turner joined in the battery on the accused

—other evidence denies this. On much evidence the jury found, on these *test questions of fact*, that Turner was not a conspirator with the Cooks, was not a party to the battery, was not assailing Clifford when shot, but standing off silent.

This Court, on this conflict, finds that the evidence of the state, in these important matters, is unworthy of belief, virtually takes the evidence of the father; because if the state's evidence is truthful, the jury could find as it did. There was as much evidence for the state in these vital matters, as for the accused, if not more. In fact, in some of them the evidence of the prisoner's father alone controls. Once it was law that the court need not certify conflicting evidence for appeal, so final was regarded the verdict approved by a judge. Now, it is different; but when such evidence gets into this Court the rule prevails that we cannot defeat a verdict except we reject all evidence of the party against whom the jury decided conflicting with that of the adverse party, and give full faith and credit to the evidence of the latter, and if the remaining evidence tends to or goes fairly to support the verdict, it must stand unless it is *clearly* not sufficient. *State* v. *Chambers*, 22 W. Va. 779; *Kimmins* v. *Wilson*, 8 *Id.* 584; *State* v. *Baker*, 33 *Id.* 319, pt. 4. We treat it as we treat a demurrer to evidence. In *State* v. *Sullivan*, 55 W. Va. 597, we said, on what we thought was sound authority, that the evidence must be considered most favorably to the verdict. But in this instance evidence to support the verdict is discredited, and full faith given to the evidence to overthrow the verdict. Whilst this Court possesses power to defeat a verdict, though the evidence is conflicting, still it should rarely do so, and only do so with extreme caution, and only where the verdict is plainly contrary to right and justice. *Robertson* v. *Harmon*, 47 W. Va. 500. This Court cannot set aside the verdict, in conflict, "merely because it thinks there is a preponderance of evidence against it or doubts its correctness," or would itself have found a different verdict. *Morien case*, 102 Va. 622. Indeed, where evidence conflicts it may be seriously questioned, even at this date, as a matter of strict legal principle, whether an appellate court can grant a new trial; for it has been held that, "upon familiar principles, recognized and approved in numerous cases, when there is a conflict of evidence, an appellate court will never set aside a verdict where

the court which tried the case and heard the witnesses, concurs with the jury and has refused a new trial." *Caldwell* v. *Craig*, 21 Grat. p. 136; note to *Grayson's case*, 6 *Id.* annotated, 712; *Michis* v. *Cochran*, 93 Va. 641, 646; *Seebright* v. *State*, 2 W. Va. 596; *State* v. *Thompson*, 21 *Id.* 741, 756; *Miller* v. *Ins. Co.*, 12 *Id.* 116, 124; *Andrews case*, 100 Va. 801. In *Grayson's case*, cited, it is held "Where the evidence is contradictory, and the verdict is against the weight of evidence, a new trial may be granted by the court which presides at the trial; but its decision is not the subject of a writ of error or *supersedeas*, or examinable by an appellate court." In 14 Ency. Pl. &. Prac. 780, it is laid down that the trial court can weigh conflicting evidence and grant a new trial, but an appellate court cannot. In strict principle I doubt whether a verdict should ever be set aside on evidence materially conflicting, but this Court has sometimes done so, especially under the act found in Codes 1891 and 1899, chapter 131, section 9. See *Johnson* v. *Burns*, 39 W. Va. 658. The opinion by JUDGE DENT in *Akers* v. *De Witt*, 41 W. Va. 229, does not seem to give this statute force to change much the rule of treatment of evidence in the appellate court on a motion for a new trial. I do not think it revolutionizes and tears down established rules in this matter, as. I said in the Johnson-Burns case. But what is above said will at least show that rarely, only in extreme cases, will this. Court reverse a jury trial on conflicting evidence. But even where there is not involved a conflict of evidence, but the question is one of *weight* of evidence, this Court has said in many cases that "in Virginia and this state the courts have always guarded with jealous care the province of a jury. If the question depends on the weight of testimony or inferences and deductions from the facts proved, the jury, not the court, are exclusively and uncontrollably the judges. This. conclusion is based upon the well-established rule, that the jury are the sole judges of the evidence, the credibility of all admissible testimony, and the inferences from the facts and circumstances proved." *State* v. Cooper, 26 W. Va. 338 ;. *State* v. *Baker*, 33 W. Va. p. 335. And this rule has been often said to apply with stronger force in this Court than in a circuit court. *Grayson's case*, 6 Grat. 712; *Sheff case*, 16 W. Va. 307. Why? Because the jury and judge saw the.

witnesses face to face and are much more competent to judge of their veracity and demeanor and weight of their evidence than are we. The opinion of Judge Faulkner, a judge of long experience and competency, is therefore better than that of any judge on this bench. So is that of the jury. For this reason we said in *Baker's case*, 33 W. Va. p. 336, upon authority then regarded by the Court good, that "where a case depends on the tendency and weight of evidence, and the jury and judge who tried the case agree in the weight and influence to be given the evidence, it is an abuse of the appellate powers of this Court to set aside a verdict because the judges of this Court, from the evidence as it is written down, would not have concurred in the verdict." *Gilmer case*, 42 W. Va. 52, 56, 57; *Hill's case*, 2 Grat. 594. Now, the *corpus delicti* is proven beyond question. It only remains to find whether the accused is excusable by way of self defense, or, if not excusable, what is the degree of his crime? Who will question that this is peculiarly a question for the jury dependant on the credit of witnesses and the weight of their evidence? *State* v. *Welch*, 36 W. Va. 690. It does appear to me that this Court has taken up scales and not only passed on the *credit* of witnesses, but undertaken to *weigh* their evidence with *nicety* just as a jury would. A circuit court can do this, but an appellate court cannot weigh evidence. *Norfolk* v. *Spencer*, 52 S. E. 310, pt. 8; 14 Ency. Pl. &. Prac. 770.

I dissent because I cannot consent to defeat and frustrate the administration of criminal justice by overruling verdicts approved by circuit courts after full and fair trial, when there is much evidence to sustain the verdict, simply because this Court thinks the jury and judge erred. My understanding is that where different men may form different conclusions upon the weight of a mass of evidence, especially if credit of witnesses is involved and the evidence is conflicting, an appellate court should not annull the trial. I venture to repeat, touching the force of verdicts, language in *State* v. *Bowyer*, 43 W. Va. 180. "The witnesses were face to face before the judge and jury. The prisoner was before them. They saw him in the ordeal of examination. They scrutinized his countenance, his demeanor, his words, his tone. They were to judge of his veracity. They discredited his denial of guilt. They saw and heard all the witnesses, all the circumstances

of the trial—often silent, but potential, evidence of the real truth. That judge and those jurors would average with us, had we been present, in capacity to judge of evidence; and as we have nothing of the actual appearance of the trial, and only the evidence in cold type, they are vastly more competent than we to pass safe judgment upon the facts. We are not a jury. We have power—mere power—to discredit verdicts, but we must be cautious in so doing.

Why have juries, if appellate judges are to go into the business of weighing evidence as if by the ounce and pound? We ought not to do this. It is an abuse of power, and a misconception of our functions and of the jury functions. The jury institution is sacred under our Constitution, and a verdict is to be highly respected. In long experience, I must say that, as a general thing, they evince good sense and do justice. From the frequency of requests to us to set aside verdicts, it seems to be thought that we can and will do so merely because we would not have found, judging from type, the same verdict; but such is not the rule, though instances deviating from these principles may be found, and I am very much averse to looseness in this matter on the part of appellate courts. And then, too, we must not forget that a learned and experienced judge approved the verdict, after witnessing the trial; and his opinion is entitled to great respect in an appellate court. *State* v. *Hunter*, 37 W. Va., 744, (17 S. E. 307). We must be careful lest we set ourselves up as judge and jury present at the trial, and usurp their functions." To same effect *State* v. *Morgan*, 35 W. Va. 260, 277. It is not merely for this case that I write this dissent, but it is to express dissent against a growing tendency to depart from volumes of decisions and treat lightly verdicts approved by trial courts and overthrow them on insufficient grounds. A verdict of twelve men, as competent to judge evidence as we, had we been present at the trial, confirmed by a judge, is overthrown by four men on evidence held as insufficient. Insufficient to prove what? Not the homicide. This is admitted. But to prove that the evidence is not sufficient to prove murder in the second degree, but only voluntary manslaughter, a matter dependent on evidence on which a jury is peculiarly fitted to judge and entitled by law to judge.