# CHARLESTON.

## STATE *v.* BEATTY.

Submitted January 29, 1902.   Decided March 22, 1902.

1. INDICTMENT—*Plea in Felony Cases.*

If, in a felony case, the record show that the defendant "plead not guilty" instead of saying, "The said defendant says he is not guilty," etc., the record is sufficient, as to the plea, to sustain a conviction. The plea operates as a legal denial of the charge laid in the indictment, going to all of its allegations, and to put the defendant upon tral, and it is sufficient if the record show that the prisoner has plead not guilty. (p. 234).

2. INDICTMENT—*Plea—Joinder—Issue.*

The omission from the record of the *similiter* or joinder of issue, in such case, does not vitiate the judgment; for the plea of not guilty, without more, legally puts the defendant on trial by jury, and the *similiter* is a mere form, although the better practice is to insert it. (p. 237).

3. INSTRUCTIONS—*Court's Duty.*

The court is not bound to instruct the jury, in a murder case, that if they find the defendant guilty of first degree murder, they may recommend in the verdict that he be confined in the penitentiary, and thus avert the infliction of the death penalty, unless the prisoner requests the giving of such instruction. (p. 239).

4. INSTRUCTIONS—*Record—Waiver.*

When, in such case, the record is silent as to the asking, giving, or refusal of such instruction, it is conclusively presumed that, if requested by the prisoner, it was given, and if it was not requested, that he waived it. (p. 240).

5. CRIMINAL TRIALS—*Record—Judgment—Reversal.*

The rule that the appellate court will not reverse the judgment of an inferior court, unless error appear upon the face of the record, and that all presumptions are in favor of the cor-

rectness of the judgment, and that errors in the rulings of the court made during the progress of the trial, and as to other matters not vital and jurisdictional in their nature, but such as may be waived, must be affirmatively shown by the record, applies to procedure in criminal as well as civil cases. (p. 240).

6. MURDER—*Degree Depends Upon Intent.*

Whether murder is of the first degree or second degree depends upon whether the act which produced death was accompanied by specific intent on the part of the slayer to take life. When such intent exists, and the circumstances of the killing are not such as to excuse or justify it, or reduce the offense to manslaughter, the homicide is murder of the first degree. Subject to the foregoing exceptions, the law is, that, when the act of the accused which results in death is accompanied by such intent, the act and intent combined include all the elements of first degree murder. In all cases of killing under circumstances which render the slayer guilty of murder, and the act which produced death was not accompanied by such specific intent, the grade of the crime is murder of the second degree. (p. 243).

7. MURDER—*Homicide—Manslaughter—Hot Blood.*

Where the killing, although intentional, is done in passion, in heat of blood, upon sudden provocation by gross indignity, out of tenderness for the frailty of human nature, the law reduces the offense to manslaughter, but, however great the provocation may have been, if there has been sufficient time for passion to subside and for reason to return, the homicide is murder. (p. 244).

8. MURDER—*Provocation—Question for Jury.*

When time has intervened between the date of provocation and the date of the killing, the question whether the killing was done in the heat of blood is for the jury, and if they find the defendant guilty of murder in the first degree, thereby negativing the existence of passion and heat of blood at the time of the killing, the court cannot disturb the verdict under the circumstances of this case. (p. 245).

Error to Circuit Court, Preston County.

J. Wesley Beatty was convicted of murder in the first degree, and brings error.

*Affirmed.*

P. J. CROGAN, for plaintiff in error.

NEIL J. FORTNEY, Prosecuting Attorney, and R. H. FREER, Attorney General, for the State.

POFFENBARGER, JUDGE:

J. Wesley Beatty was convicted of murder in the first degree without recommendation of imprisonment, in the circuit court of Preston County on the 20th day of December, 1900. A motion in arrest of judgment and to set aside the verdict and grant a new trial was overruled and sentence of death was pronounced against the prisoner. He has brought the case here on a writ of error, claiming that the court erred in overruling a motion to quash the indictment and in overruling the motion to set aside the verdict, that the record does not show any plea entered, that there was no *similiter* or joinder and that the record should show affirmatively, as it does not, that the court instructed the jury that they had the discretion, if they found the defendant guilty of murder in the first degree, to recommend, in their verdict, that he should be punished by confinement in the penitentiary, and upon such further finding that the punishment would not be death, but confinement in the penitentiary during the life of the prisoner, as provided in section 19 of chapter 159 of the Code.

The indictment is in the form prescribed by the statute, and it has been so often held sufficient by this Court that it is usless to take time or space to discuss it or even refer to the authorities.

As to the plea, the record shows the appearance in person of the defendant on the 12th day of December, 1900, and that "thereupon the defendant plead 'Not guilty' to the indictment," and the case was continued. On the 20th day of December, 1900, the defendant again appeared in person, with an attorney to assist him, and, with the consent of the court, withdrew his plea of not guilty and moved the court to quash the indictment. After showing that the motion was overruled the order says, "thereupon the defendant plead 'Not guilty' to the indictment; whereupon a jury was selected and sworn according to law" etc. It is needless to say that this is not the form in which a plea of not guilty is usually entered, or that it is usual for the record to show that there was a joinder by the State in the issue tendered by the plea. However, the only question, in respect to the plea, is whether it is sufficient. It is in the past tense and ordinarily the record shows that the prisoner "says he is not guilty" etc. 1 Chitty Crim. Law 720, says, speaking of the King's Bench:

"In this record, all the acts of the court ought to be stated in the present tense, as *praeceptum est,* not *praeceptum fuit;* but the acts of the parties themselves may be properly stated as past. And therefore if it state that sheriff *was* commanded, instead of *is* commanded, the error will be fatal." The strictness, as to matters of form, which governed the proceedings in the early history of our jurisprudence, has been much relaxed, and if the use of the past instead of the present tense in entering the plea would have vitiated a conviction in former times, it would hardly do so now. But it is to be noticed that by the law relied upon in this connection it is not required that the acts of the parties shall be stated in the present tense but only the acts of the court. Pleading not guilty was undoubtedly the act of the defendant and not of the court and it is sufficient if the record shows that he did so plead. Arraignment of the prisoner is the act of the court, but that preceded the plea, (1 Chitty Crim. Law 720), and in this State it has been dispensed with by statute. Section 2, chapter 159, Code. It cannot be said that the plea is the arraignment or a part of it and, therefore, the act of the court. Arraignment was the calling of the defendant to the bar of the court by his name and commanding him to hold up his hand, so that he might be completely identified as the person named in the indictment. Then the indictment was read to him in full so that he might know what he was charged with, after which the question was put, "How say you, (naming the prisoner), are you guilty or not guilty?" All this our statute dispenses with. The prisoner is now entitled to a copy of the indictment, his witnesses and counsel, and must be personally present during the trial but no arraignment is necessary. Formerly, in response to the question above quoted, he was compelled to answer *ore tenus* either guilty or not guilty. If he answered guilty that was a confession of the offence which was followed by punishment as if he had been tried and convicted. If his answer was not guilty, then the clerk made a minute of it on the indictment and put it in form if it afterwards became necessary to make up the record. Archbold's Cr. Pr. & Pl. 333, 334; Whar. Prec. Ind. Pl. 1138. When written out it appeared in the record as follows: "He being immediately asked how he will acquit himself of the premises above laid to his charge, says he is not guilty thereof, and thereof for good and for ill he puts himself upon the country." So it seems

that at common law it was only necessary that a minute of the plea be preserved and that it was not the practice to enter it in full except when it became necessary to make up the record. It was a mere minute on the indictment. Our practice is different. We make the record as to the orders in the case as we go. But as it was never necessary for the record to show more than that the defendant entered his plea of not guilty, is it not sufficient if it simply says he "plead not guilty?" Had the prisoner in this case filed a formal plea of not guilty in writing, it would be sufficient to make it part of the record, merely to refer to it in the order as his plea of not guilty. Then if the order further showed that at the time it was filed, the defendant was in court in person and so pleaded, as this record shows in respect to this prisoner, it would amount in substance to a formal plea, and a full compliance with all the essential requirements of the law. The non-essentials, mere worthless formalities, of the law in its early state, have been pruned away and eliminated by the courts and by legislation, until nothing remains except what is essential and substantial. As has been shown, arraignment and proclamation are no longer required. Anciently, if the prisoner stood mute and refused to answer and say whether he was guilty or not guilty in capital felonies, and it was found upon a formal inquiry by jury that he stood obstinately mute and was not dumb *ex visitatione Dei,* he received the terrible sentence of penance, which was in substance, that he was put into a low dark chamber, laid on his back, naked, and a weight of iron, as great as he could bear, placed on his body, and was to have no sustenance except on one day three morsels of the worst bread, and on the second day three draughts of standing water, that should be nearest to the prison door, and with only these given, on alternate days, he should so remain until he died. *U. S.* v. *Gibbert,* 2 Sumner, (U. S.) 67. All this useless formality and brutality has been done away with by the simple provision, that if the prisoner stand mute and refuse to plead or answer and do not confess his guilt, the court shall have the plea of not guilty entered and the trial shall proceed as if the accused had put in that plea. Some other changes are due to alterations in the mode of procedure. Anciently, the prisoner was allowed to choose his mode of trial. That was when there might be a trial by wager of battle or by jury. Now, there is but one method, namely, by jury, the trial by wager of

battle having been abolished, and there is no longer any reason why the clerk, after the prisoner has entered his plea, should say "How will you be tried?" and to receive in answer thereto the response, "By God and my country," and to reply, "God send you a good deliverance." Whar. Prec. Ind. & Pl. 1138. All these mutations conclusively show that the law attaches no importance to mere matters of form. All that it requires is that the substantial rights of the prisoner be preserved and that all the essential steps, required by law to be taken for the conviction of the prisoner, shall be observed and followed. One of them is that he shall be given an opportunity to plead and that there can be no conviction unless a plea has been entered, although every other step necessary to conviction shall have been taken. *Hoskin* v. *State,* 84 Ill: 87; *Gould* v. *People,* 89 Ill. 216; *Douglass* v. *State,* 3 Wis. 820; *People* v. *Gaines,* 52 Calif. 480; *State* v. *Aler,* 39 W. Va. 549. But is it not enough that this record shows that the prisoner did plead not guilty? What virtue or force is there in the formal words of the plea? The words, "Not Guilty," are a full and complete answer and response to every allegation contained in the indictment. They are so understood by the court and the prisoner is fully protected in the progress of the trial by the rulings of the court in reference to the admission and rejection of testimony, and the prisoner may have the benefit of the court's instructions to the jury upon every proposition of law arising in the case by simply asking for them. His protection lies not in the formal words of his plea but in its legal denial of his guilt of the charge laid against him in the indictment and in the fair, impartial and legal trial of the issue thus raised, by jury under the supervision and direction of the court. These views lead to the conclusion that the failure of the record to formally set out the plea does not vitiate the proceedings and the conviction.

It has been held by this Court in *State* v. *Aler,* 39 W. Va. 549, that "the omission of the *similiter* or joinder by the prosecuting officer is, at most, a mere formal defect, at any time amendable, and it does not render the verdict bad." JUDGE ENGLISH, who delivered the opinion of the Court in that case, cites in support of his views, Gould on Pleading, 290, s. 20; *Babcock* v. *Huntington,* 2 Day 392; *Whiting* v. *Cochran,* 9 Mass. 532; *Bank* v. *Kimberlands,* 16 W. Va. 555; Bishop Cr. Proc. s. 1354. All these authorities so hold, without adverting to

the fact that it is said that the English practice is that in cases of treason and felony no issue is joined with the prisoner on behalf of the Crown. Whar. Prec. Ind. & Pl. 1138, note, citing Stark. C. P. 472, which is not in the library. An exhaustive review of this question will be found in the case of *U. S.* v. *Gibbert* v. *Sumner,* (U. S.), 19, 65, 72, by Judge Story, and his conclusion in that case, which was a capital one, the conviction being for piracy and robbery, was that there was nothing in the objection, that there was no joinder of issue by a formal *similiter*. After disposing of that question and numerous others in the case he pronounced upon the prisoners the sentence of death. His opinion being applicable to the effect of the plea of not guilty, as well as the want of a *similiter,* it is here quoted in part: "What is the reason, even at the common law, of asking the prisoner how he will be tried? It is to ascertain whether he consents to a trial by jury. If he does not consent in any clear and determinate manner, it is manifest that he cannot object that the form has not been gone through, if the substance has been preserved. Now, in the present case there is the most ample proof of a consent, if consent were necessary, by the acts of the prisoners, and of their counsel before and at the trial. And if the prisoners had refused to consent, the trial must have been in the same manner precisely as it has been had. But I confess for one, that I deem it a little short of an absurdity in the Courts of the United States to call upon the prisoners, after they have pleaded not guilty, to say how they will be tried, when the constitution and laws have peremptorily required the trial to be by jury. Suppose the prisoners had been asked, how they would be tried, and they had answered that they wished for no trial at all; must not the court have proceeded to try them upon the plea of not guilty? Suppose they had answered that they wished to be tried by the court, could the court have tried the cause otherwise than by jury? Suppose they had been silent as to how, and when, and whether, they should be tried, could the court have done otherwise than order a trial by jury? We have no authority to inflict the punishment of the *peine forte et dure* (and I trust our courts never will have it), and our laws manifestly contemplate no such thing as either legal or necessary. It appears that by a recent statute in England (Stat. 8 Geo. 4 ch. 28) it is provided that, if a person being arraigned upon an indictment for treason,

felony or piracy, shall plead thereto a plea of not guilty, he
shall by such plea, without further form, be deemed to have
put himself upon the country for trial. And this is precisely
what our laws, in my judgment, do in effect prescribe. The
provision was indispensable in England, since the refusal of the
prisoner to state, after he had pleaded not guilty, how he would
be tried, was deemed in law as standing mute. In our law he
can not be deemed to stand mute, when he has pleaded not
guilty. The Constitution decides how he shall be tried, inde-
pendent of any election on his part. The plea of not guilty
puts the party for all purposes upon his trial by jury. My judg-
ment, therefore, is that there is nothing in this objection." The
authorities are so conclusive upon this question that the earnest
appeal of the attorney for the prisoner for the overruling of
the decision in *State* v. *Aler* cannot be granted.

Several pages of the brief for plaintiff in error are taken up
with the argument that the record should show that the jury
were instructed, as to their discretion under the law, to recom-
mend imprisonment by their verdict, and thus avert the inflic-
tion of the death penalty. That this is not necessary, has been
decided in *State* v. *Cobbs,* 40 W. Va. 718. The syllabus reads
as follows: "It is not error for a court to omit to instruct a
jury that it may punish murder in the first degree with either
death or confinement in the penitentiary, unless asked to do so."
It is useless to repeat the exhaustive discussion of JUDGE
BRANNON on this question, but there are some further consid-
erations which are pertinent. This Court cannot presume that
there is error in the judgment of the court below. The judg-
ment of that court is presumed to be right and that presump-
tion must stand unless it is affirmatively shown that there is
error in it. An appellate court will not reverse the judgment
of an inferior court unless error affirmatively appear upon the
face of the record. All presumptions are in favor of the cor-
rectness of the judgment. *Shrewsbury* v. *Miller,* 10 W. Va.
115; *Richardson* v. *Donahoo,* 16 W. Va. 687, (pt. 14 Syl.);
*Griffith* v. *Corrothers,* 42 W. Va. 59. Hence, the presumption
here is that if it was the duty of the court below to so instruct
the jury, the court performed that duty. There is nothing be-
fore this Court which indicates affirmatively that the court did
not do so except the brief of the attorney for the plaintiff in
error, and that is not part of the record. Unless the rule of law,

prevailing in this State, that error must affirmatively appear in the record, to warrant a reversal, is abandoned, and the opposing theory, that the courts do not do their duty, is to be adopted in lieu thereof, it must be held here either that the prisoner waived his right to have such an instruction, or that the court gave the instruction. It is easy to conceive of circumstances which may have led the prisoner to waive that right, and under which he would not thereby be prejudiced. If the attorneys on both sides in the argument of the case plainly state it to the jury that they might exercise such discretion, it is quite probable that no instruction in reference to it would be asked for, and it is equally clear that this waiver could do the prisoner no harm. All the court can do by its instruction is to tell the jury that they have discretion to say whether the prisoner shall be confined to the penitentiary or put to death, in case they find him guilty. And if it is effectually brought to their attention by counsel so that an instruction from the court would be useless and barren of effect, there is no good reason why the court, on its own motion, should instruct. It may be said that under this rule of presumption a court may not always perform its duties, conceding it to be the duty of the court to give the instruction, for it can never come to this Court affirmatively, as error, except when the court refuses the instruction after the prisoner has asked it. Nobody is likely ever to object to it, and unless there is some exception of some kind to the action of the court in reference to it, the instruction can never become a part of the record. It may be argued that this argues the necessity of an affirmative showing in the record of the instruction to the jury. But that is equally true of any other instruction which a perusal of the record shows that the court ought to have given, if requested, but is silent as to whether it was given or not. If the doors be opened on this question in reference to instruction on the discretion of the jury to recommend imprisonment or not, it would completely overturn the principles of our criminal procedure. It is impossible for the appellate court to know what instructions were asked, given or refused, unless by some exception; they are made a part of the record. The instruction which it is claimed the court did not give in this case may have been given. If it was given there is no way by which the record could be made to show that it was given, unless the usual forms of procedure were departed from. If this Court is to presume

that proper instructions were not given simply because the record fails to show that they were, it would devolve upon the State to show that every possible precaution was taken to establish the innocence of the prisoner, a thing which is absurd in itself and contrary to all legal principles. Stripped of bills of exception which are only put in the record to show error, it is only necessary that the record show that there has been an indictment, that the prisoner has pleaded to the indictment, that a jury has been empaneled and heard the evidence and argument of the counsel and rendered a verdict, that the court has pronounced sentence according to law and that the prisoner has been present in person during all the proceedings. In the absence of bills of exception it is not necessary that any of the numerous rulings of the court made during the progress of the trial shall appear in the record. It never was the law that a prisoner could not waive questions relating to the admissibility of testimony and instructions, or even an erroneous conviction, for if he does not proceed in the appellate court to be relieved from it he must suffer its consequences. To do away with the presumption of the regularity of the proceedings of the court below in the absence of any apparent error in the record, would render it almost impossible to convict a guilty man of crime. This provision of the statute allowing discretion to the jury as to punishment was not known to the common law. Death was then the result of every conviction of murder and when the law stood so, the presumption of regularity in the proceedings was as rigidly enforced as it is now. This statutory provision does not intensify, but ameliorates the penalty which the law pronounces in the absence of a recommendation. If the legislature intended that it should be the duty of the court to instruct the jury as to this provision, the act would no doubt have so stated, for it cannot be presumed that the law-making power of this State was ignorant of the principles governing the procedure of the courts. Moreover, it had before it the constitution of the State by which certain inalienable rights are guaranteed to the citizen and if it was the intention of the legislature to put this provision upon an equality with those rights, it would have prohibited the conviction of any person of a capital crime in any case wherein the court failed to instruct the jury that they had the discretion to recommend imprisonment. The language of the Bill of Rights is that no person shall be held to answer for

treason, etc., unless on presentment or indictment of a grand jury, no bill of attainder, *ex post facto* law, etc., shall be passed. Excessive bail shall not be required nor excessive fines imposed, etc. No person shall be transported out of, or forced to leave the State for any offence, etc.; nor shall any person, in a criminal case, be compelled to be a witness against himself, or be twice put in jeopardy for life or liberty for the same offence. No person shall be deprived of life, liberty or property, without due process of law or the judgment of his peers. As has been shown, it must affirmatively appear from the record that some of the rights, guaranteed by these prohibitory clauses of the constitution, have not been violated. If the language of the act forbade a conviction without such instruction, then it might be argued that the record must show that it had been given, but it neither contains such inhibition, nor a direction that any instruction be given as to it. If there is any mandate, requiring the trial court to give such instruction, except upon the request of the prisoner, it is not found in the constitution nor in the statute nor in the principles of criminal procedure. The right to such an instruction stands upon the same footing as the right to other instructions. It may be given on the trial of any indictment for murder, when there is evidence to warrant a conviction of murder in the first degree, but in this respect it is not different from other instructions which may be given in every such case, such as that the jury must believe from the evidence, beyond a reasonable doubt, that the defendant is guilty. In no sense, therefore, is it distinguishable in principle from instructions respecting the duty of the jury and the rights of the prisoner under other provisions and principles of law. This recommendation does not precede conviction but follows it. Conviction legally forfeits the life of the prisoner. Failure to recommend imprisonment takes from him no right guaranteed by the law. His life is forfeited for his crime. The right to it depends solely upon the mercy which the jury may extend or withhold, and it is not in the power of this or any other court to restore it to him. There is but one resort left to him and that is to the Executive for pardon or commutation. It is far different from the natural rights of the citizen which the constitution guarantees. The argument of the brief is in part that in the absence of knowledge that the jury were instructed, it cannot be known that they were aware of their power to save this man

from death by recommendation. That is true, but it is equally true that this Court does not know that they were not instructed and that by the rules of law it must be presumed that they were so instructed or that the prisoner waived the instruction.

Assuming that he did waive it, he had the right to do so, and his failure to ask it amounts to a waiver. Assuming that it was given, it did not bind the jury to recommend imprisonment, nor has the court any power to take from the jury, by instruction, its discretion. Although it might appear here that it was a proper case for recommendation, this Court has no power to review the discretion of the jury.

The brief for plaintiff in error does not argue insufficiency of the evidence to sustain the verdict but it is proper, in such a case as this, to consider with some degree of care, whether there may be some error that has been overlooked. Beatty and David Nine were brothers-in-law, Beatty's wife being the sister of Nine. On the day before the killing Beatty's son had been arrested at the instance of Nine and charged with having broken into Nine's cellar and taken some cider or wine. On the following morning at about 8 o'clock, Nine and Jas. F. Norris, a farm laborer, were at Nine's barn. Norris was husking corn in the barn near the door. Nine was hauling corn in the fodder to the barn and storing it therein. He had just taken the last arm load from the sled and carried it through the door and back into the barn, when Beatty came in after him, carrying a shot gun, not on his shoulder, but in his hands. Norris says Beatty was at his (Norris') elbow before he saw him. They spoke to each other in the usual friendly manner and Norris said to him, "I thought you was going to a wood-sawing," and Beatty said, "I am going after a bit." Then as Nine approached Beatty, coming toward the door from back in the barn, where he had deposited the corn, the former said, "Good Morning," or "How do you do," to which Beatty responded, "How are you Nubbin," or "How are you old Nubbin," using a nick name. Then he said "Look here Dave, you have been keeping wine and cider in that cellar ever since you had it, enticing boys to drink it, and you have ruined my boy, and brought disgrace upon me and my family, now I want you to pay me what you owe me." Nine said "Beatty, what do I owe you?" The prisoner replied, "You know you stole a lot of timber from me and never paid me for it." In the same instant he brought his gun

to his shoulder. Nine, being about ten feet from the prisoner and seeing this act, turned and ran back into the rear part of the barn, and, as he ran, the prisoner fired three shots, the first taking effect in the arm, the second in the back and the third missing. The victim fell and expired in a few minutes. Upon these facts this Court is bound to say as matter of law, that they are amply sufficient to sustain the verdict. From them, the jury were warranted in finding all the elements of murder of the first degree, the wilful, deliberate and premeditated killing of a human being. How could they have found otherwise than that the shooting was done with the specific intent to take life? Specific intent to kill, in doing the act which results in death, constitutes first degree murder and includes all its elements, unless done under circumstances which justify or excuse the act, such as killing in self-defense when it is necessary for the slayer to kill his assailant to save his own life, or taking life for the prevention of an atrocious crime, attempted to be committed by force, such as murder, robbery, house-breaking in the night time, rape or mayhem; or when the grade of the offense is reduced to manslaughter because the killing is done in the heat of blood, as in a sudden quarrel or when a person under great provocation, by gross indignity, immediately kills his aggressor. *State* v. *Morrison,* 38 S. E. 481; Whar. Hom. ss. 4, 5, 6, 7, 8, 9 and 10. There is no second degree murder when the act which blots out a human life is done with intent to kill. That is the decisive test as to the degree of murder. When such intent accompanies the act, the crime, if any, is either murder of the first degree or manslaughter. It cannot be manslaughter unless the killing is done in passion, but where sufficient time has elapsed after provocation given, to permit passion to subside and reason to return, the homicide is murder. "However great the provocation may have been, if there be sufficient time for the passion to subside and for reason to interpose, the homicide will be murder. Thus, in the case already given of an adulterer, if the husband kill him deliberately and upon revenge, there having been sufficient cooling time, the provocation will not avail in alleviation of the guilt. And where a father was informed that a man had wantonly whipped his son, a small boy, and on the evening of the next day he met the man, and then beat and stamped him with his fist and feet, whilst he was unresisting, with so much violence that the man died from the effects of the

beating on the next night, it was held that this was murder, there being evidence of deliberation." Whar. Hom. s. 448. It was for the jury to say whether the prisoner did the killing in heat of blood. Whar. Hom. s. 449. They have found that he did not. That was the only question in the case as to which there was any possible room for doubt. The provocation had been given the day before, the prisoner had come from his home about a mile distant, he was armed with a shot gun, he came into the barn with it in his hands ready for use, and not on his shoulder as if he had been casually passing by with it, and with his declaration about the immediate cause of his coming, he coupled his complaint and grievance about former trouble or disagreement between them. Upon shooting down the deceased, he said, "You will never trouble anybody else," or "bother anybody else." These are facts and circumstances underlying the finding of the jury, which preclude this Court from disturbing the verdict. They are abundantly sufficient to sustain the finding that the killing was deliberate and premeditated and not the result of passion. If, in any case the finding of a jury on this peculiar question might be set aside by the Court, it cannot be done in this instance. The evidence too clearly sustains it.

There is no error in the judgment and it must be affirmed.

*Affirmed.*