STATE OF WEST VIRGINIA

*v.*

MELVIN LOVELESS

(No. 10617)

Submitted January 19, 1954. Decided March 9, 1954.

*Capehart, Miller & Capehart,* for plaintiff in error.

*John G. Fox,* Attorney General, *Robert E. Magnuson,* Assistant Attorney General, for defendant in error.

BROWNING, JUDGE:

Melvin Loveless was indicted at the May, 1953 Term of the Circuit Court of Logan County on two counts: Murder, and accessory before the fact of murder. Subsequently, on June 8, 1953, at the same term, a special

grand jury met and indicted Loveless as an accessory before the fact of murder. The case was set for trial on June 15, 1953, upon a plea of not guilty, and on that day a written motion for a continuance was filed, assigning as grounds: (1) The hostile attitude of the court at that time due to the fact that at a previous trial of another involved in the murder, a witness, Beatty, in whose home the offense was committed, assaulted one of the attorneys for the defense; (2) that said Beatty would be a witness at the trial and should have time to cool off; (3) that newspaper articles had been highly prejudicial to Loveless; (4) that trial was set for one week after the return of the June 8 indictment, which did not allow a reasonable time in which to secure the presence of witnesses; and (5) counsel had had no opportunity to consult or talk to the persons theretofore tried or who had pleaded guilty to the same offense. The motion then set out that there had been no other continuance on behalf of Loveless, and recited several newspaper articles which were alleged to be highly prejudicial and inflammatory.

The motion for a continuance was overruled, the case proceeded to trial, and a verdict of guilty, without recommendation, was returned by the jury. Judgment was entered on the verdict, sentencing the defendant to be executed, to which this Court granted a writ of error and supersedeas on September 1, 1953.

Numerous errors have been assigned as grounds for reversal, but in the briefs and argument, counsel have apparently abandoned all except the following: (1) The court erred in overruling defendant's motion to quash the indictment; (2) the court erred in overruling defendant's motion for a continuance; (3) the court erred in giving to the jury State's Instruction No. 2; (4) there is a fatal variance between the indictment and the evidence introduced by the State; (5) the verdict of the jury required the imposition of a heavier penalty upon the defendant as an accessory before the fact than was imposed upon the principals; and (6) the court erred in not properly instructing the jury as to the effect of its verdict

should it find the defendant guilty of murder in the first degree.

The defendant relies upon the court's charge to the grand jury as reported in the press to sustain the first assignment, but this record does not disclose that such a motion was made to the trial court, nor was the point assigned as error in the motion for a new trial. The question can not be raised for the first time in this Court, inasmuch as an accused waives secondary defects in an indictment when neither demurrer nor motion to quash is interposed. However, he does not thereby waive primary defects therein, that is, he does not waive the objection that the facts stated do not constitute an offense, but that point is not urged by counsel, and an examination of the indictment in this case shows that it clearly meets the requirements of the Constitution that the defendant be advised therein of the character and nature of the accusation against him.

On the morning of defendant's trial, his counsel submitted to the court a written motion for a continuance. A discussion of this motion and assignment of error as to the court's ruling thereon requires a more detailed recitation of the facts. The crime for which the defendant was convicted was committed on the morning of April 29, 1953, and at the regular term of the Logan County Circuit Court, which convened on May 12, 1953, Albert K. Puckett, Douglas Eugene Sherman, James R. Jones and Charles Edward Ford were indicted as principals, and the defendant was indicted both as principal and accessory before the fact to the murder. A sixth man, Davis Jefferson Williams, apparently also was indicted by the regular grand jury, but whether as a principal or an accessory is not clear from this record, he having been committed to an institution, and has not yet been arraigned. On the 15th day of May, trials were set for those indicted for the Reed murder, the date of defendant's trial being fixed for May 28, subsequent to all the others. Thereafter, and prior to the 28th, Jones and Ford were tried jointly by a jury and convicted of murder in

the first degree with a recommendation of imprisonment, and Puckett and Sherman subsequently pleaded guilty to murder in the first degree, and all four were sentenced to a term of life in the penitentiary. In view of alleged contradictory statements made by the four men, whose cases had already been disposed of, the prosecuting attorney requested the court to convene a special grand jury for the purpose of re-indicting Loveless. Such a special grand jury was called for June 8, 1953, and an indictment was returned against the defendant similar to the previous one, but different in that an additional person was named as being a principal in the murder. The written motion recites, in support of the defendant's contention that a hostile atmosphere existed against him, an altercation that occurred at the trial of two of the defendant's alleged accomplices during the same term of court between Nelson Beatty, in whose apartment the murder took place, and Ira P. Hager, an attorney of Logan, and of defense counsel in that case. The motion states that Hager was assaulted by Beatty during the trial, and that when Hager rushed into the courtroom to report the altercation that there was a stampede of spectators in the courtroom, and officers were required to draw their revolvers to restore order. The principal reliance for a continuance, however, is based upon several newspaper articles which had appeared in the Logan Banner, a daily newspaper with general circulation in Logan County; The Charleston Gazette, likewise a daily newspaper with a large circulation in that county; and the Bluefield Daily Telegraph, which it was alleged had a small circulation in certain sections of the county. Shortly before the date of defendant's trial, an article of May 28 in the Logan Banner gave considerable details of the opening of the trial on that day of Ford and Jones. Reference is made to the fact that "four other men implicated in the holdup-murder will follow today's trial. They are Melvin Loveless, Charleston numbers operator, who is reported to be the instigator of the crime, * * *." The article related in some detail the opening statement to the jury by the prosecuting attorney in which the defendant Loveless

was depicted as the leader of the group of men charged with the offense. Mr. D. Boone Dawson, also of counsel for the defense in that case, was quoted as telling the jury that: "* * * Loveless had been planning the robbery for sometime and that he was familiar with Beatty's habits. He added that Loveless contacted Puckett and Williams in Martinsville, Virginia, and then asked Ford and Jones to join in the proposed robbery. He said the two young men on trial today got into the thing before they knew what they were getting into and that when things turned out as they did there was nothing for them to do but to tell the truth."

An article from the Charleston Gazette of June 9, under an associated press heading, referring to the re-indictment of the defendant, said "* * * Six men, including Loveless, were rounded up within a few days of the slaying. Co-defendants of Loveless, identified by Mayor John T. Copenhaver of Charleston as a numbers racketeer, said he organized the robbery in the belief that Beatty had $45,000 in the apartment. * * *"

An article from the Logan Banner, under date of June 8, and under a headline which stated. "SPECIAL GRAND JURY CONVENES MURDER INDICTMENT IS SOUGHT BY STATE.", quoted excerpts from the judge's charge to the jury:

> " 'Some have been tried,' the judge said, referring to five other men who were indicted by the regular session of the grand jury in connection with the Reed case, 'and some have pleaded.'
>
> " 'It is imperative that these cases be completed this term of court.' Judge Chambers added. 'I have called this special grand jury in order to offer the man a speedy trial. I believe that a man should have a trial as soon as possible.' "

The article further states that the judge told the jurors that if the prosecuting attorney had other cases to present they should consider them and remain in session as long as it was necessary to complete the work that was

to be done. An article of similar import was quoted from the Bluefield Daily Telegraph.

The prosecuting attorney produced seven witnesses, residents of different sections of Logan County, who orally testified that they had neither heard nor observed anything to indicate that the public generally was inflamed or prejudiced against the defendant to the extent that he could not get a fair trial. At the end of this testimony, the defendant, by counsel, orally asked the court to consider one additional ground in support of the written motion for a continuance. Counsel informed the court that deputy sheriffs were stationed at the two entrances to the courtroom, and that they were searching "or pet (sic) down each of the men spectators and witnesses who come in, and search the pocketbooks of the women spectators, and this is done in view of the assembled jurors, and indicates to some degree the state of tension and uneasiness which surrounds this trial." The court stated upon the record that the altercation between Beatty and Hager was a personal one with reference to some remark Hager had made during argument of the former case, and that, although some commotion was created in the courtroom when Hager announced in the presence of the crowd that he had been assaulted, shortly thereafter the court room was settled and the trial proceeded. The court further stated that it did not order the searching of spectators as they entered the courtroom, but that it had instructed the sheriff to keep the aisles and halls clear so that the trial could be carried on in an orderly manner. The judge said that he assumed that the reason the sheriff was searching the people as they entered the courtroom was because the court had received a letter "from some 'crack pot' containing a warning or threat, not against the defendant at bar, but against the Court or officials of the court, if anybody, advising him not to try the Loveless case on Monday, saying any other day would be O.K." The court said further "that is perhaps the reason the sheriff is taking the security measure to see that the Court, counsel, witnesses

or anybody are not shot in the court room. The Court feels there is no danger." The motion for a continuance was overruled.

Counsel for defendant rely upon the case of *Delaney* v. *U. S.*, 199 F. 2d. 107, (1st Cir. 1952), in support of their contention that it was reversible error not to grant a continuance upon the showing made. In that case the Circuit Court of Appeals of the 1st Circuit reversed the conviction of a former collector of internal revenue who was indicted and tried upon charges that he had received payment to influence his decision and action regarding the collection of income taxes, and for making false certificates of the discharge of tax liens, upon the ground that the defendant had made a proper showing for a continuance. In the *Delaney* case, subsequent to the indictment, and prior to the trial, a congressional investigating committee conducted public hearings concerning defendant's activities. These hearings received nation-wide publicity. The court in setting aside the conviction and awarding a new trial said: "This is not a case of pretrial publicity of damaging material, tending to indicate the guilt of the defendant, dug up by the initiative and private enterprise of newspapers. Here the United States, through its legislative department by means of open committee hearings held shortly before the trial of a pending indictment, caused and stimulated this massive pre-trial publicity, on a nation-wide scale. * * *" No decision of this Court can be found involving the precise ground for a continuance offered in this case, although the question has been dealt with often upon a motion for change of venue. The defendant did not ask for a change of venue, stating in the motion that he had no reason to believe that he could not get a fair trial in Logan County at the succeeding term of the court, but that for the reasons hereinbefore stated, he could not get such a trial at the time the case was to be heard.

The defendant relies upon information contained in newspaper articles and the oral statement regarding the searching of courtroom spectators to sustain his motion

for a continuance, and also relies upon statements alleged to have been made by the court, subsequently quoted in newspaper articles for purposes other than a continuance. There is no further showing in the record as to what transpired upon the prior days of the term of court when the cases of the four alleged accomplices were disposed of. The statement attributed to the Circuit Judge by the Logan Banner article of June 8, heretofore quoted, wherein he was alleged to have stated that it was imperative that the cases arising out of the murder of Sarah Reed be completed at that term, and that he was calling a special grand jury to offer the man a speedy trial, as he believed that a man should have a trial as soon as possible, can not be considered upon defendant's Assignment of Error No. 1, but only upon the question of whether or not a sufficient showing had been made for a continuance.

On June 8, when the special grand jury was convened and instructed by the court, there was no reason for the defendant or his counsel to be present, and the court's charge to the jury, if thereafter reduced to writing, is not a part of this record. It is presumed that if the statements attributed to the court were made to the special grand jury at that time, that the venire of petit jurors then in attendance, and from which a panel was later selected ·to try the defendant, was excluded from the courtroom and did not hear the remarks attributed to the court. It is not necessary to speculate upon the view that this Court might take upon this assignment of error if the record disclosed that the alleged statements of the court to the special grand jury were made in the presence of the venire of petit jurors. The record is silent upon that matter. Furthermore, the record does not disclose the interrogation of the panel of petit jurors upon their *voir dire*. Again, we can only presume that a panel of qualified jurors was selected, and that counsel for the defendant had an opportunity at that time to inquire as to what effect, if any, the newspaper articles and prior proceedings involving the other alleged accomplices of the defendant, had upon the prospective jurors.

"It is a well settled rule, and one already stated previously in this title, that a motion for a continuance is addressed to the sound, but not arbitrary, discretion of the court under all the circumstances of the case, and that the appellate court will not reverse a judgment or decree because of the action of the lower court on such motion, unless the action is plainly erroneous. Abuse of discretion and prejudice to the complaining party are essential to reversal. But the appellate court will review and reverse the action of an inferior court, if, in the exercise of its discretion, it has harshly or unjustly refused a continuance, especially where there is nothing in the circumstances to warrant the conclusion that the real purpose in moving for a continuance is to delay or evade and not to prepare for it." 4 M. J., Continuances, § 50. *State* v. *Lucas,* 129 W. Va. 324, 40 S. E. 2d. 817, and *State* v. *Whitecotton,* 101 W. Va. 492, 133 S. E. 106. Also, in *State* v. *Alie,* 82 W. Va. 601, 96 S. E. 1011, this Court said: "* * * A motion for a continuance is always addressed to the sound discretion of the court. Of course this discretion is one not to be abused, but before this court will reverse a judgment because of the refusal to grant a continuance it must affirmatively appear that the party seeking it was injured thereby. * * *" The defendant has not shown by this record that the trial court abused its discretion in denying the motion for a continuance, and, therefore, its ruling upon that point will not be disturbed.

In the giving of State's Instruction No. 2 by the court, the jury was not erroneously instructed. The instruction reads as follows:

"The Court instructs the jury that an accessory before the fact is one who is absent at the time of the actual perpetration of the crime, but who procures, counsels, commands, incites or abets another to commit the crime.

"And, you are further instructed that the accessory need not necessarily have intended the particular crime committed by the principal; an accessory is liable for any criminal act which, in the ordinary course of things, was the natural or

probable consequence of the crime that he procured, advised or commanded, although such consequence may not have been intended by him."

This instruction clearly and properly defines an accessory before the fact. The defendant objects to the instruction principally because of its use of the word "abet" contending that the word indicates that the defendant was present at the commission of the alleged crime, and, therefore, was a principal. The word is defined in Black's Law Dictionary, Third Edition, as follows: "To encourage, incite, or set another on to commit a crime. This word is always applied to aiding the commission of a crime. To abet another to commit a murder is to command, procure, or counsel him to commit it, * * *."

The defendant contends that there is a fatal variance between the indictment and the evidence introduced by the State to sustain it because each of the principals who testified at the trial denied that he fired the shot which caused the death of Sarah Reed, and no one testified as to who fired such shot. The evidence shows that Sarah Reed fired one shot through a latched screen door, and that thereafter approximately eleven shots were fired by the four members named as principals in this indictment, and it is not denied by the principals that several shots were fired by them. The defendant does not contend that there was not sufficient evidence offered by the State to support the verdict, and there is no assignment of error upon that point. There was sufficient evidence presented by the State from which the jury could have believed, beyond all reasonable doubt, that, pursuant to a plan conceived by the defendant, he and the other five men traveled to Logan on the night of the crime for the express purpose of burglarizing the Beatty apartment; that the party stopped a short distance from Logan and the defendant, using one of the two cars in which they were traveling, made a reconnaissance to ascertain if all was clear at the scene of the subsequent crime, and upon returning, reported such to be; that the defendant remained at that place while the other five members of the group

proceeded to the Beatty apartment where the robbery took place, and Mrs. Reed was killed; and that these five men returned to the place where the defendant waited, and all traveling in two cars returned to the Loveless Hotel in Charleston where the fruits of the robbery, amounting to six hundred dollars, were distributed between the six persons.

While it is true that there can be no accessory to a crime not committed by a principal, as this Court held in *State v. Lilly,* 47 W. Va. 496, 35 S. E. 837, this evidence clearly, and beyond all reasonable doubt, establishes that one of the four principals fired the shot which killed Sarah Reed, and, inasmuch as her murder occurred during the commission of and resulting from the robbery, the principal participants were equally guilty of murder in the first degree, and the evidence fully supported the charge against the defendant of being an accessory before the fact of murder. The State having proved that the death of the deceased resulted from a shot fired by one of the principals, it was immaterial which of the four actually fired the fatal shot.

There is no merit to the contention that the verdict of the jury mandatorily required the imposition of a more severe penalty upon the defendant as an accessory than was imposed upon the actual perpetrators of the homicide. It is true that four of the alleged accomplices of the crime, whose cases were disposed of prior to that of the defendant, received sentences of life imprisonment, while the defendant was sentenced to be executed.

Syllabus Point 3 in *People v. McCaudle,* 14 N. E. 2d., 683, relied upon by the defendant to sustain his position upon this assignment of error, reads as follows: "An accessory before the fact can be indicted and convicted as a principal but penalty assessed against such accessory can in no event be greater than punishment that could be inflicted upon principal." That case has no application to the present one, inasmuch as the principals could have been punished by execution. The test is not whether the

principals received a more severe penalty than the accessory, but whether or not the former could, under the law, have received a penalty equal to that imposed upon the accessory.

Chapter 61, Article 11, Section 6 of the West Virginia Code, provides for the punishment of an accessory before the fact as follows: "In the case of every felony, every principal in the second degree, and every accessory before the fact, shall be punishable as if he were the principal in the first degree. * * *"

Upon his final assignment of error, the defendant maintains that it was the mandatory duty of the court to instruct the jury that, unless they recommended in their verdict that the accused should be confined in the penitentiary, in the event it found him guilty of murder in the first degree, it would be mandatory upon the court to impose a sentence of death. It is not contended by the defendant that the court erred in instructing the jury upon the evidence adduced that it could return only one of two verdicts, murder in the first degree or not guilty.

Chapter 61, Article 2, Section 2 of the Code, provides: "Murder of the first degree shall be punished with death, except as provided in article three, chapter sixty-two of this Code." Chapter 62, Article 3, Section 15, to which reference is made, provides for the verdict and sentencing in a murder case as follows: "If a person indicted for murder be found by the jury guilty thereof, they shall in their verdict find whether he is guilty of murder of the first or second degree. If they find him guilty of murder of the first degree, they may, in their discretion, further find that he be punished by confinement in the penitentiary. If such further finding be not added to their verdict, the accused shall be punished with death, but,.if added, he shall be punished by confinement in the penitentiary during his life. If the accused plead guilty of murder of the first degree, sentence of death or confinement in the penitentiary for life shall be pronounced upon him by the court, as may seem right, in the same manner and with

like effect as if he had been found guilty by the verdict of a jury."

At common law, there were no degrees of murder, and all murder was punishable by death. It is only by statute that murder has been divided, as it has in this State into murder in the first degree and murder in the second degree. In *State* v. *Cobbs,* 40 W. Va. 718, 22 S. E. 310, Syl. Pt. 1, this Court held that: "It is not error for a court to omit to instruct a jury that it may punish murder in the first degree with either death or confinement in the penitentiary, unless asked to do so." The opinion in that case was written by Judge Brannon, and the *Cobbs* case was affirmed on this point in *State* v. *Beatty,* 51 W. Va. 232, 41 S. E. 434, in an opinion written by Judge Poffenbarger. However, in *State* v. *Chaney,* 117 W. Va. 605, 186 S. E. 607, the rulings in the *Cobbs* and *Beatty* cases were specifically overruled. The only syllabus point of the opinion is as follows: "It is the duty of the trial court, in prosecutions for murder, to inform the jury, without request, of their authority under Code (1931), 62-3-15, to determine whether the accused, if found guilty of murder in the first degree, shall be punished by death or confinement in the penitentiary for life. The rulings in *State* v. *Cobbs,* 40 W. Va. 718, 22 S. E. 310, and *State* v. *Beatty,* 51 W. Va. 231, 41 S. E. 434, in so far as they may be in conflict with this decision, are overruled." The decision in the *Chaney* case was reaffirmed in *State* v. *Goins,* 120 W. Va. 605, 199 S. E. 873, in which a conviction of murder in the first degree, without a recommendation that the defendant be punished by confinement in the penitentiary, was set aside, and the Court in its opinion said: "Concerning the assignment of the failure of the trial court to instruct the jury that it was its duty to find, in the event of a verdict of guilty of murder in the first degree, whether the accused should be hanged or sentenced to the penitentiary for life, there can be no question but that this constitutes reversible error. Without suggestion or request, this is the trial court's duty. This Court, in *State* v. *Chaney,* 117 W. Va. 605, 186 S. E. 607, emphatically so held. It does not appear from

the record that the trial court had its attention directed to this duty, but that fact does not correct the error."

The attorney general, on behalf of the State, contends that the trial court did properly instruct the jury in accordance with the decisions in the *Chaney* and *Goins* cases in the giving of State's Instruction No. 1 which is as follows:

> "The Court instructs the jury that murder by poison, lying in wait, imprisonment, starving, or by any wilful, deliberate and premeditated killing, or killing in the commission of, or in the attempt to commit arson, rape, robbery, or burglary, is murder in the first degree.

> "The Court further instructs the jury that murder in the first degree is punishable by death or confinement in the penitentiary of this State for life, as the jury shall find in their verdict."

This instruction follows the statute heretofore quoted, but only in a general way. The instruction that is usually given in homicide cases where, under the indictment a verdict of murder in the first degree may be returned, is set forth in Lee, The Criminal Trial in the Virginias, Second Edition, Section 1342, which reads in part as follows: "* * * If you should find the defendant guilty of murder in the first degree you may, in your discretion, further find that he be punished by confinement in the penitentiary, and if such finding be not added to your verdict the judgment rendered thereon by the Court would be that the prisoner be punished with death, and if such finding is added, the judgment rendered thereon by the Court would be that he be confined in the penitentiary during his life. * * *" This instruction, or one similar to it, following the provisions of the statute, is certainly sufficient. The principal issue confronting this Court in reviewing this case is to determine whether State's Instruction No. 1 sufficiently informed the jury concerning the effect of the verdict they should return if they found the defendant guilty of murder in the first degree, inasmuch as it finds no reversible error elsewhere in this record.

The verdict of the jury reads as follows: "We, the jury, agree and find the defendant Melvin Loveless guilty of Accessory before the fact to Murder in the first degree as charged in the within indictment." The jury by their verdict found neither that the defendant should be punished by death nor by confinement in the penitentiary. It is quite true, under the provisions of Code, 62-3-15, with no further finding added to such a verdict, that the punishment shall be death. However, the jury are the triers of the facts, and there is no presumption that they are familiar with the law. The law applicable to the case must come from the trial court in the form of instructions. It may be that counsel for the State and defendant in their arguments to the jury explained in detail the effect of their returning the verdict which they did, and the manner by which they could have returned a verdict which would have resulted in life imprisonment for the defendant. The arguments of counsel are not contained in this record, and, even if they were, and if they did show such explanation it would be of no consequence, inasmuch as the jury looks not to counsel for guidance as to the law of the case, but to the trial court. They may disregard all that is said by counsel in argument, but they are not at liberty to disregard the law of the case as outlined to them in the court's instructions. If the jury had responded to State's Instruction No. 1 telling them that "murder in the first degree is punishable by death or confinement in the penitentiary of this State for life, as the jury shall find in their verdict.", it would have been necessary for them to add to the verdict a further provision that the defendant be punished either by death or confinement in the penitentiary. This jury was not instructed that if they found the defendant guilty of murder in the first degree and remained silent thereafter that by virtue of the law of this State it became the mandatory duty of the trial court to sentence the defendant to death by electrocution. Under the provisions of Code, 61-2-15, the penalty for rape, upon a verdict of a jury without recommendation for mercy, does not impose upon the trial court the mandatory

duty of sentencing the prisoner to death, but in such case discretion is vested in it, not the jury, as to which of the two penalties, life imprisonment or death, shall be imposed. The exact opposite is true upon a verdict of murder in the first degree. If the effect of the jury's verdict is to require the court to impose the death penalty, then the jury should be so informed. We are of the opinion that State's Instruction No. 1 did not inform the jury with sufficient clarity as to the legal significance of such a verdict as it later returned. If it could be said that the trial court discharged the duty imposed upon it by the decisions in the *Chaney* and *Goins* cases, *supra,* by the giving of this instruction, then the verdict is still not responsive for it fixes the penalty at neither death nor life imprisonment, as the incomplete and misleading instruction informed them they were required to do. The verdict can be validated only by invoking the pertinent provisions of Code, 62-3-15, the import of which was never revealed to the jury by any instruction that was given by the court. A verdict whose solemnity requires the taking of the life of a human being should not be predicated upon presumption or probability that such a result was contemplated by the jury which returned it.

It is the mandatory duty of a trial court when a case is submitted to a jury, in which a verdict of murder in the first degree may be returned, to instruct the jury that in the event such a verdict is returned that they may further find that the accused be punished by confinement in the penitentiary, in which case the defendant will be sentenced to life imprisonment, and that in the absence of such finding, a sentence of death must be pronounced by the court. It was reversible error for the trial court in this case not to give to the jury, without request, such an instruction.

The judgment of the Circuit Court of Logan County is reversed, the verdict of the jury set aside, and the case remanded for a new trial.

*Reversed and remanded.*

RILEY, JUDGE, concurring:

After consideration of the record in this case and the opinion of the Court I am prompted to write this separate memorandum recording my concurrence in the holding of the Court in reversing the judgment of the Circuit Court of Logan County, setting aside the verdict of the jury, and granting the defendant a new trial. Specifically, I concur in all three points of the syllabus, but I do not agree with the position taken in the opinion of the Court that the trial court did not abuse the sound discretion, which is vested in every trial court in this State, in refusing to grant the defendant a continuance. As the well written opinion of the Court sets forth in detail many of the facts upon which this concurrence is based, it will be necessary to restate them in this note only in a rather general way.

With the greatest of deference to the members of this Court, who have joined in the opinion of the Court and to the able and experienced Judge of the Circuit Court of Logan County, I feel it my duty to state that the conditions under which the defendant Loveless was tried, and the spirit of hostility, which evidently pervaded the courtroom of the Circuit Court of Logan County before and during the trial, resulted in the defendant being tried for a crime, which involved his very life, under conditions and in circumstances which render it very difficult for this Court to determine whether the defendant had, or could have had, a fair and impartial trial, such as is consonant with our American system of justice. At least in a case such as this we dare not hazard a surmise or a guess. This Court should ever be on guard to prevent the trial of a defendant in a criminal case, especially a case involving a crime such as this which is revolting to the minds of respectable citizens, where there is an atmosphere of hostility against the defendant, or where the trial is not conducted with the greatest quietness and decorum.

The record in this case discloses that the Honorable John T. Copenhaver, Mayor of the City of Charleston, a city many miles distant from the place of the trial, had

designated the defendant prior to the trial as a "racketeer", which designation was carried in newspapers of general circulation in Logan County, namely, The Charleston Gazette and The Bluefield Daily Telegraph, and articles prejudicial to the defendant also had appeared in The Logan Banner, a newspaper published in Logan County, and widely circulated in that county. Of these articles the one most prejudicial to the defendant was published by The Logan Banner on June 8, 1953, about one week prior to the date upon which the defendant was to be tried. In this article under the headline "SPECIAL GRAND JURY CONVENES MURDER INDICTMENT IS SOUGHT BY STATE", the Judge of the Circuit Court of Logan County is quoted as charging the grand jury: "Some have been tried (referring to the five other defendants who were indicted at the regular session of the grand jury in connection with the Reed case) and some have pleaded. It is imperative that this case be completed this term of court. I have called this special grand jury in order to offer the man [Loveless] a speedy trial."

Under Article I of the Amendments to the Constitution of the United States (the First Amendment) and West Virginia Constitution, Article III, Section 7, the provisions of the United States and the State Constitutions, which provide for freedom of the speech and press, the above-mentioned newspapers had the constitutional right, and because of the general interest which their readers would have in the trial of this case, they had a moral right to print all the news, including the interview with the Mayor of the City of Charleston, and the charge of the Judge of the Circuit Court of Logan County. This Court, of course, should not be concerned with the propriety of Mayor Copenhaver's statement to the newspapers, but the interview having been given, the newspapers certainly had the right to publish it, notwithstanding such publication would, in view of the wide circulation of the newspapers involved, be dangerously apt to create prejudice in the minds of potential jurors against the defendant Loveless. Loveless was being tried in Logan County for being an accessory

before the fact to an alleged ruthless, unconscionable and cold-blooded murder of a woman in connection with an alleged robbery. The question before the Circuit Court and the jury of Logan County was whether he was guilty of that crime, and that crime only. That he may have been a notorious racketeer, having been engaged in unlawful activities in the City of Charleston, had no connection with the crime with which he was charged, and his designation as such racketeer was, in my opinion, prejudicial to defendant receiving a fair and impartial trial.

That a spirit of hostility and high-strung human emotions prevailed in the courtroom at the time the defendant was tried clearly appears from the record. At the trial of the other defendants an altercation occurred between one Beatty, at whose apartment Mrs. Reed was killed, and a prominent member of the Logan County bar, which, the motion for a continuance discloses, resulted in peace officers drawing their guns, and at the trial of this defendant deputy sheriffs stood at every door of the courtroom, and in the presence of the Judge and of the very jury which tried and convicted this defendant, searched every person, witnesses, attorneys and spectators alike, who entered the courtroom.

I do not by this memorandum intend to criticize or condemn the motives which the Sheriff of Logan County had in authorizing the activities of his deputies. He evidently believed he was doing his sworn duty in protecting the life of the Circuit Judge, who was the recipient of a threatening letter in connection with the Loveless trial. I do, however, think that the searching of persons by deputy sheriffs in the circumstances portrayed by this record was dangerously apt to impress the jury that Loveless was a dangerous criminal, whose friends might resort to violence against the constituted authorities in order to free him. I simply say that such actions on the part of constituted authorities, though prompted by the highest motives, have no place in any courtroom, where the rights, liberties, and even the life of a defendant are concerned. Whether a search should have been made of those enter-

ing the courtroom on the day of the trial is not for me or this Court to say, but, if such search was required, it could have been made outside the doors of the courtroom and outside the presence of the jury.

That the defendant Loveless, as the trial court stated in its charge to the grand jury, was entitled to a speedy trial, cannot be gainsaid. In this regard I can do no better than to quote from the opinion of this Court in the case of *State* v. *Jones,* 84 W. Va. 85, 99 S. E. 271, 273, wherein the Court speaking through the Honorable Charles Wesley Lynch, a former eminent member of this Court, said: "* * * Embedded in the common law of the land is the principle of a fair and impartial trial alike in civil and criminal cases. To the extent reasonably avoidable no innocent person should be permitted to suffer the stigma and punishment incident to an offense of the commission of which he is not guilty, is an equally familiar and often reiterated legal principle. The duty to accord speedy trials is founded in sane reason and sound law, constitutional and and statutory. But speed ought not to be permitted to work injustice, and, lest it should do so, the provisions therefor, as we have seen, are qualified in the Constitution by the significant phrase, 'without unreasonable delay,' and in the statute by the like phrase 'unless good cause be shown for a continuance'."

I am well aware that the principle that a motion for a continuance is addressed to the sound discretion of the trial court in all the circumstances of the case is well settled in this jurisdiction, but "the discretion of trial courts with regard to continuances must be exercised with due regard to the constitutional guarantee of a fair and impartial trial to one accused of a crime, and the right to call for evidence in his favor." 4 M. J., Continuances, Section 2. This sound discretion, with all deference, I say has been abused.

Judge Lovins has authorized me to say that he joins in this concurrence.